JOSEPH KIMBRO, PLAINTIFF IN ERROR, *v.* CUTHBERT BULLITT, THOMAS D. MILLER, AND LLOYD D. ADDISON, PARTNERS IN TRADE UNDER THE NAME AND STYLE OF BULLITT, MILLER, & Co.

Where bills of exchange were drawn by the principal acting partner of a firm in the name of the firm, all the partners were responsible.

Whenever there are written articles of agreement between the partners, their power and authority, *inter se*, are to be ascertained and regulated by the terms and conditions of the written stipulations. But, independently of any such stipulations, each partner possesses an equal and general power and authority, in behalf of the firm, to transact any business within the scope and objects of the partnership, and in the course of its trade and business.

Where partnerships are formed for the mere purpose of farming, one partner does not possess the right, without the consent of his associates, to draw or accept bills of exchange, for the reason that such a practice is not usual, nor is it necessary for carrying on the farming business.

In the present case, the jury found that this was a trading firm, and their verdict is conclusive.

The right of the acceptors, who had paid the money, to recover from the drawers, cannot be affected by the fact that one of the drawers had applied the money to an unlawful purpose.

*Kimbro* v. *Bullitt et al.*

THIS case was brought up by writ of error from the Circuit Court of the United States for the middle district of Tennessee.

The suit was brought upon three bills of exchange, which were accepted and paid by Bullitt, Miller, & Co., the drawees, for the accommodation of the drawers, Dement, Kimbro, & Sons, of which firm Joseph Kimbro was a partner. This action was brought by Bullitt, Miller, & Co., against Joseph Kimbro alone. The place of business of the firm of Dement, Kimbro, & Sons, was in Mississippi. Kimbro resided in Tennessee, and therefore was sued there.

The defence set up in the court below rested on two grounds, viz:

1. That Dement, the principal acting partner of the firm of Dement, Kimbro, & Sons, had no power to draw the bills sued on.

2. That the bills were drawn for the purpose of raising money to be laid out in the purchase of slaves to be carried into Mississippi for sale; which slaves were so carried in and sold, contrary to laws of Mississippi.

On the trial, the judge charged the jury in the following words:

"The court charge the jury that Dement, the principal acting partner of the firm of Dement, Kimbro, & Sons, had power to draw the bills given in evidence, according to the proof adduced to them, if true; that if the bills were accepted and paid at maturity by the plaintiffs for said firm, the defendant, Joseph Kimbro, was responsible, and it mattered nothing to the plaintiffs how the proceeds of the bills were disposed of, as this was a fact the plaintiffs could not know, and were not bound to prove."

This ruling was excepted to, upon which the case was brought up to this court.

It was argued by *Mr. Benjamin* for the defendants in error, no counsel appearing for the plaintiff in error.

*Mr. Benjamin* said:

1. The charge that Dement had power to draw the bills was correctly given, and is sustained by the proof.

The witness, Ready, deposed that he knew the firm of Dement, Kimbro, & Sons, in or near Lexington, Holmes county, Mississippi; that Joseph Kimbro was a member. of the firm; that the firm commenced business on the 1st January, 1853, and continued till the death of Dement, one of the partners, on the 3d October, 1853; that the business of the firm was farming, steam saw-mill, and general trading, and that Dement was the principal business partner.

The witness, West, confirmed the depositions of Ready, and added, that "Dement was the principal financier of the firm of Dement, Kimbro, & Sons; did the principal trading, borrowed money, and paid it back, &c., in the name of the firm."

The partnership articles, as introduced by defendant, provide for a copartnership between Dement, the defendant, Joseph Kimbro, and the two sons of the latter, "for the purpose of farming, and also of running a steam saw-mill—the parties of each part to furnish one-third of the capital stock of the partnership, or the said party of the second part to furnish two-thirds of said capital stock, on behalf of himself and his two sons, parties of the third part; and the said parties are to furnish negroes or hands, stock, provisions for man and beast, and all necessary utensils, in the same proportion, and are to pay and defray the expenses of said copartnership, and share its profits in the same proportion; * * * and the said parties of the third part are to superintend—one of them the said farm, and the other the said mill; and the said party of the first part is to render them such needful assistance as he can, without any extra charge therefor; and at the expiration of said two years, after paying the debts of said copartnership. the profits are to be equally divided between said parties of the first, second, and third parts, &c."

Botters, a witness for defendant, testified that "said firm, so far as I know, has never been held out by any of the Kimbros as having any more extensive powers than those conferred by said articles—(Joseph Kimbro, senior, the defendant, left here for Tennessee either a day or two before or a day or

two after said articles were signed, and did not return until next fall;) nor did ever said Dement do so with the knowledge of defendant, so far as I know."

"Planting and mill partnerships in this country are not numerous, and it is no easy matter to say what powers are by usage exercised by the several partners, without the express consent of their copartners in such partnerships; but among the few partnerships of the kind that have come to my knowledge, where money has been needed, and the several partners cannot be consulted, the managing one raises the money on his own credit, and charges the same to the partnership."

On the foregoing testimony, it is plain that even *inter se* there was such a trading partnership as authorized the drawing of bills by one partner in the name of the firm; although the farming business might not authorize the exercise of such a power, running a saw-mill for two years necessarily required the purchase of the requisite stock of wood, and its re-sale as boards, planks, scantling, &c. The business of running a steam saw-mill is neither more nor less than a manufacturing business, requiring the purchase of raw material and sale of the manufactured article; all such partnerships are trading partnerships, in which the power to draw bills of exchange in the partnership name is vested in each partner.

In mining partnerships, and farming partnerships, it has been held that such powers are not vested in the partners; and the reason is, that their business is simply to sell the produce of the real estate, to make profits out of the soil by gathering its fruits; but wherever the business imports in its nature the necessity of buying and selling, the partnership is in its essence a trading partnership.

The general doctrine is admirably summed up in the opinion of Chief Justice Marshall, in the case of a manufacturing partnership.

Winship *v.* Bank of the U. S., 5 Peters, 529.

So it was held that one partner could bind the firm by a promissory note, where the partnership was for carrying on the business of farming and coopering.

McGregor *v.* Cleveland, 5 Wendell, 475.

And although there be no partnership in real estate, the parties being tenants in common, yet if they are common tenants of timber land, and do a lumber business, they are trading partners in the timber cut from the land.

Baker *v.* Wheeler, 8 Wendell, 505.

Coles *v.* Coles, 15 Johns. R., 160.

Partners in a steam saw-mill are bound by the note of the partnership given by some of the partners for partnership purposes.

Johnston *v.* Dutton, 27 Alabama, 245.

And even where the partnership is limited, a note by one of the partners, in the name of the firm, is *prima facie* for the firm's account.

Holmes *v.* Porter, 39 Maine, (4 Heath,) 157.

See, also, Story on Partnership, sec. 102.

And it makes no difference as to the power of a partner to bind the firm, that the trade was a particular and limited trade

Chitty on Bills, 10th Am. ed., p. 44.

2. But, independently of the question as to the powers of the partners in controversies *inter se*, as regards the present case, where the holders of the bills are third persons, ignorant of the special partnership agreement, the partnership is bound, because it was actually engaged in general trading, and Dement, who signed the bills, was the ostensible principal business partner. It was in the light of a general trading partnership that this firm exhibited itself to the public; it adopted by its articles a partnership style or firm of "Dement, Kimbro, & Sons," without any indication of a restriction in its business; the fact of its carrying on a general trading business was proven by Ready and West, and the charge was, that under this proof, if true, Dement's signature of the bills in the firm name bound the firm. It was quite immaterial whether or not there existed a secret contract limiting his powers.

Story on Partnership, secs. 111, 126, 130.

Collyer on Partnership, sec. 386.

Gow on Partnership, pp. 52 to 55.

3 Kent's Commentaries, pp. 40 to 45.

Winship *v.* Bank U. S., 5 Peters, 529.

Cargill *v.* Cosby, 15 Miss., 425.

Nicholls *v.* Cheairs, 4 Sneed, (Tenn.,) 229.

Frost *v.* Hanford, 1 E. D. Smith, 540.

And in the above case of Cargill *v.* Cosby, the test of the power to draw bills and notes in the name of the firm is stated to be, whether the business was to "buy and sell." It is plain that the business of a steam saw-mill cannot be conducted without buying and selling.

3. Independently of the legal presumption that the bills drawn in the partnership name were for partnership account, Ready's testimony shows that Dement, the deceased partner, was at his house at about the date of the bills, with certain negroes; "spoke of them as firm negroes, and employed Nesbit to take them in charge and sell them, and keep McAfee from having anything to do with them, or the funds arising from the sale of them; his object being to save Joseph Kimbro from loss, and to meet the liability to Bullitt, Miller, & Co., and to Bolton, Dickens, & Co., incurred in the purchase of these negroes by the firm of Dement, Kimbro, & Co., in connection with Morgan McAfee and William M. Joyne."

The partnership articles show that negroes were necessary for their business, and that the parties promised to furnish them for carrying it on.

4. The only remaining point to be considered is the legality of the second charge of the judge, "that if the bills were accepted and paid at maturity by the plaintiffs for said firm, the defendant, Joseph Kimbro, was responsible, and it mattered nothing to the plaintiffs how the proceeds of the bills were disposed of, as this was a fact the plaintiffs could not know, and were not bound to prove."

It may be proper to premise that it is perfectly immaterial in the present case whether this charge was well founded in law or not, because the plantiffs' replication to the defendant's fourth plea joined issue on the fact whether or not the bills were drawn and accepted for the purpose of raising money to purchase slaves for importation into Mississippi for sale contrary to law; and there is not a particle of evidence to support the plea, the only evidence on the point being that of Ready,

(above referred to,) which establishes the purchase in Vicksburg.

But in point of law the instruction was clearly right.

The idea that money loaned or advanced cannot be recovered because the borrower applies it to an unlawful purpose was never countenanced by any jurist.

It is true that *ex turpi causa non oritur actio.* But what is the contract now before the court? A contract for advancing money. There is nothing illegal in that. If the money was to be applied to an unlawful purpose, the illegality was in the application, not in the borrowing. The contract for purchasing the slaves might be in contravention of law; and if so, would not be enforced in a court of justice; but, on the ground now assumed by plaintiffs in error, it would be incumbent on the court to refuse to maintain an action for the price of goods sold, if the purchaser could prove that the vendor intended to raise money by the sale, to be applied to an unlawful purpose. The proposition will not bear an instant's examination. The whole doctrine on the subject was scrutinized and the true principles governing it settled by this court in 1826, and the law is now too well established to require any further citation of authorities.

See Armstrong *v.* Toler, 11 Wheat., 258.

Mr. Justice CLIFFORD delivered the opinion of the court.

This case comes before the court upon a writ of error to the Circuit Court of the United States for the middle district of Tennessee. It was an action of assumpsit brought by the present defendants against the plaintiff in error, to recover the amount of three several bills of exchange, particularly described in the declaration. As exhibited in the transcript, the several bills of exchange bear date at Lexington, in the State of Mississippi, on the second day of April, 1853, and purport respectively to have been drawn and addressed to the original plaintiffs by one Morgan McAfee, and by Dement, Kimbro, & Sons. They were each for the sum of two thousand dollars, and were severally made payable to the order of the first-named drawer, by whom also they were duly endorsed. Two of them

were likewise endorsed with the firm name of the other drawers. At the time the bills of exchange were executed, the original defendant was a member of the firm of Dement, Kimbro, & Sons; and it was conceded, in the pleadings and at the trial, that the bills of exchange were drawn and negotiated by the senior partner of that firm. All the members of that partnership, except the defendant, were citizens of the State of Mississippi at the time the suit was commenced, and were residing out of the jurisdiction of the court; and for that reason, as alleged in the declaration, the other partners were not sued in this action. In the court below, the plaintiffs claimed to recover against the defendant, upon the ground that the firm, of which he was a member, were the drawers of the bills of exchange, and that they, the plaintiffs, had paid the amount, or the principal portion of the same, out of their own funds, as acceptors, for the accommodation of the drawers. Without attempting to give any very definite analysis of the several pleas filed by the defendant, it will be sufficient for the purposes of this investigation to state that he set up two distinct grounds of defence in answer to the claim of the plaintiffs:

1. To the merits of the claim he pleaded the general issue, and denied specially that he ever drew the bills of exchange described in the declaration, or that he ever authorized any one to draw them in his name, or in the name of his firm.

2. For a further defence, he also alleged, in his fourth plea to the amended declaration, that the bills of exchange were drawn and endorsed by Dement, and accepted by the plaintiffs, for the purpose of raising money to be laid out in the purchase of slaves, to be imported from some other State or Territory of the United States, for sale, into the State of Mississippi, which slaves he alleged to be afterwards purchased with the money and imported into the State, and there sold, according to the original intent, contrary to the form of the statute of that State in such case made and provided. To that plea the plaintiffs replied, traversing the allegations of fact, and tendering an issue, which was duly joined. Some of the pleas resulted in issues of law, all of which were ruled in favor of the

plaintiffs, and the defendants acquiesced in the rulings of the court.

Evidence was then introduced on both sides upon the issues involving the merits of the claim, and the court instructed the jury that Dement, the principal acting partner of the firm, had power to draw the bills given in evidence according to the proof adduced to them, if true; that if the bills were accepted and paid at maturity by the plaintiffs for the firm, the defendant was responsible, and it mattered nothing to the plaintiffs how the proceeds of the bills were disposed of, as that was a fact the plaintiffs could not know, and were not bound to prove.

Under the charge of the court, the jury returned their verdict in favor of the plaintiffs for the amount claimed, deducting certain admitted credits, according to the account exhibited in the transcript, and the defendant excepted to the instructions of the court. It is obvious, on the first reading of the instruction, that it contains two distinct propositions, and no doubt is entertained that both were intended to be controverted by the exceptions. In the first place, it affirms that the evidence adduced, if found to be true, was sufficient to show that the acting partner of the firm, of which the defendant was a member, had power to draw the bills of exchange described in the declaration. According to the proofs introduced by the plaintiffs, the firm commenced business at Lexington, in the State of Mississippi, in January, 1853, and the partnership was continued, without interruption, until the third day of October, of the same year, when it was terminated by the death of the senior partner. They also proved, by two witnesses, that the firm was engaged during that period in farming, carrying on a steam saw-mill, and in general trading. Both of these witnesses testified that the senior partner, who drew the bills of exchange in question, was the active business partner of the firm; and one of them added, that he did the principal trading, and borrowed money, and paid it back in the name of the firm.

Their partnership agreement was introduced by the defendant. It bears date on the fifth day of January, 1853; and the

partnership was formed, as recited in the instrument, to continue for the term of two years, for the purpose of farming and of carrying on a steam saw-mill. By its terms, one-third of the capital stock was to be furnished by the senior partner, one-third by the defendant, and the remainder by his two sons. Those five persons constituted the firm, under the name and style before mentioned. And it was further stipulated that negroes or hands, stock, provisions, and all necessary utensils, should be furnished by the respective parties, according to their interest in the capital stock, and that they should defray the expenses of the copartnership and share its profits in the same proportions. They also designated the farm to be carried on, and stipulated that the steam saw-mill should be located at such place as a majority of the partners in interest should determine.

After the partnership agreement was executed by the parties, it was deposited with a third person; and it appeared from his deposition, taken by the defendant, that it remained in his possession from that period to the time of his examination. In the same deposition, the witness testified that the firm, so far as he knew, had never been held out by the defendant as having any more extensive powers than those conferred by the partnership agreement.

Some attempt was made by the defendant to prove that it was the usage, in partnerships of this description, when money was wanted to carry on the business, and the several partners could not be consulted, for the managing partner to raise it on his own credit, and charge it to the partnership; but the proof was not sufficient to show any such general usage.

Such was the substance of the evidence on which the charge of the court was based, and we think it was of a character to justify that part of the instruction under consideration. Our reasons for that conclusion will now be briefly stated.

That one of several partners composing a trading firm has power to draw bills of exchange, unless restricted from so doing by the terms of the copartnership agreement, is a proposition which, it is presumed, no one will dispute. Whenever there are written articles of agreement between the partners,

their power and authority, *inter se*, are to be ascertained and regulated by the terms and conditions of the written stipulations. But, independently of any such stipulations, each partner possesses an equal and general power and authority, in behalf of the firm, to transact any business within the scope and objects of the partnership, and in the course of its trade and business.

Acts performed by one of the partners, in respect to the partnership concerns, and in the usual course of its business, differ in nothing, so far as their legal consequences are concerned, from those transactions in which they all concur; and for the reason, that, by the commercial law, each partner of a trading firm is presumed to be intrusted by his copartners with a general authority in all the partnership affairs. Accordingly, it was held, in Hawkin *v.* Bourne, (8 Mee. and Wels., 710,) that one partner, by virtue of the relation he bears to the firm, is constituted a general agent for another, as to all matters within the scope of the partnership dealings, and has con ferred upon him, by virtue of that relation, all authorities necessary for carrying on the partnership, and all such as are usually exercised in the business in which they are engaged. Any restriction which, by agreement among the partners, is attempted to be imposed upon the authority which one partner possesses, as a general agent for the other, is operative only between the partners themselves, and does not limit the authority as to third persons, who acquire rights by its exercise, unless they know that such restrictions have been made.

Contracts made by one of several partners, in respect to matters not falling within the ordinary business, objects, and scope of the partnership, are not binding on the other partners, and create no liability to third persons, who have knowledge that the partner making the contract is acting in violation of his duties and obligations to the firm of which he is a member. But whenever credit is given to the firm, within the scope and objects of the partnership, and in the course of its trade and business, whether the partnership be of a general or limited nature, it will bind all the partners, notwithstanding any secret stipulations or reservations between themselves,

which are unknown to those who give the credit. Harrison *v.* Jackson, 7 Term., 207; Pinkney *v.* Hall, 1 Salk., 126; Lane *v.* Williams, 2 Vern., 277; Swan *v.* Steele, 7 East., 210; Byles on Bills, p. 31; 3 Kent Com., p. 40; Story on Part., sec. 105; Collyer on Part., sec. 401.

Apply these principles to the facts disclosed in evidence, and it is clear that the power of the acting partner was ample to authorize him to draw the bills of exchange in the name of the firm, unless it can be shown that the firm of which he was a member was not one falling within the general rules of law defining and regulating the rights and obligations of partners engaged in the transactions and business of trade.

All partnerships, says Chancellor Kent, are more or less limited; and there is none that embraces, at the same time, every branch of business. Such limitations are generally to be found in the terms and stipulations of the articles of co-partnership; but they may arise from general usage, or, to a certain extent, from the character of the business, and the nature of the objects to be accomplished.

Partnerships are sometimes formed by those who are interested in real estate, for the mere purpose of farming; and in respect to that class of business arrangements, it has been held, that one of the several partners does not possess, by virtue of that relation merely, the right, without the consent of his associates, to draw or accept bills of exchange, for the reason that such a practice is not usual, nor is it necessary for carrying on the farming business. Collyer on Part., (ed. 1848,) sec. 402; Greensdale *v.* Dower, 7 Barn. and Cres., 635; Dickerson *v.* Valpy, 10 Barn. and Cres., p. 138, per Little-dale, J.

In the case last named, it was held that a certain mining company fell within the same exception; and, on the facts disclosed, no doubt the question was well decided. But the mere circumstance that the business consists in making profits out of real estate, as in working a stone quarry, will not necessarily take the case out of the operation of the general rule. Thicknesse *v.* Brownilow, 2 Cromp. and Jerv., 425.

Farming partnerships, when strictly confined to that pur-pose, are held to be within the exceptions to the general rule, upon the ground, as assumed by the counsel for the plaintiffs, that their principal object is to make profits out of the soil, by gathering its fruits, and that the partners are in no proper sense engaged in trade; but wherever the business, according to the usual mode of conducting it, imports, in its nature, the necessity of buying and selling, the firm is then properly re-garded as a trading partnership, and is invested with all the powers and subject to all the obligations incident to that re-lation. McGregor *v.* Cleaveland, 5 Wen., 475; Winship *v.* Bank of United States, 5 Pet., 529; Baker *v.* Wheeler, 8 Wen., 505; Coles *v.* Coles, 15 Johns. R., 160; Johnston *v.* Dutton, 27 Alabama Rep., 245; Hedley *v.* Bainbridge, 3 Q. B., 321.

Another answer, however, may be given to the objection to this part of the instruction, which is entirely conclusive against it. According to the evidence, farming was not the sole business of the partners composing this firm. They were also engaged in running a steam saw-mill, for manufacturing purposes; and common observation will warrant the remark, that those who engage in that business always want capital to carry it on, and frequently find it necessary to ask for credit. Like those engaged in other branches of manufac-tures, they buy and sell, and have occasion to remit money and collect it from distant places.

Two witnesses also testified at the trial that this firm was engaged in general trading; and there was no evidence in-troduced by the defendant to contradict their statements. Whether the witnesses were entitled to credit, and whether, in point of fact, this firm was a trading firm, were questions which were properly submitted to the jury. By the verdict, both questions were found in favor of the plaintiff, and the finding of the jury is conclusive.

2. One other point only remains to be considered, which arises out of the second proposition contained in the charge, of the court. It was to the effect, that if the bills of exchange were accepted and paid at maturity by the plaintiffs for the

firm, then the defendant was responsible, and it mattered nothing to the plaintiffs how the proceeds were disposed of.

No evidence was offered by the defendant in support of the issue raised by his fourth plea to the amended declaration, and there was none in the case tending to show that the proceeds had been applied to any illegal object, or in any manner misappropriated. Such being the fact, it is obvious that this part of the instruction became entirely immaterial; which, of itself, is a sufficient answer to the objection.

But another answer may be given to the objection, which perhaps will be more satisfactory; and that is, we think it was clearly correct. It will be observed, that this part of the charge was based upon the theory that the bills of exchange were drawn by the firm of which the defendant was a member; and properly so, for the reason that the question of authority to draw them had been disposed of in the preceding part of the charge.

In considering this objection, then, it must be assumed that the bills were drawn by the firm, and that they were duly accepted and paid by the plaintiffs at maturity, on account of the firm; and if so, it is not perceived how their right to recover the amount can be affected by the fact that one of the drawers applied the money to an unlawful purpose. Where a contract grows immediately out of and is connected with the illegal or immoral act of the party claiming the benefit of it, courts of justice will not lend their aid to enforce it. Armstrong *v.* Toler, 11 Wheat., 258.

But the illegal act, if any, in this case, was performed by one of the drawers of the bills, and not by the acceptors. Suppose one of a firm should borrow money of a third person, in the name of the partnership, and apply it to an unlawful purpose, it surely could not defeat the right of the lender to recover on the contract.

Regarding this point as too clear to be the subject of dispute, we forbear to pursue the discussion.

After a careful examination of the exceptions, we think they cannot be sustained. The judgment of the Circuit Court is therefore affirmed, with costs.