## BARNETT BANK *v.* CHIATOVICH
### No. 2658

January 5, 1925.                    232 Pac. 206.

1. APPEAL AND ERROR — JURY'S FINDING THAT PLAINTIFF WAS INNOCENT PURCHASER OF NOTE IN SUIT SUPPORTED BY EVIDENCE HELD CONCLUSIVE.

Jury's finding supported by evidence that plaintiff is innocent purchaser in good faith for value before maturity, of note in suit, is conclusive.

2. BILLS AND NOTES—FRAUD IN CONTRACT OR CONSIDERATION OUT OF WHICH NOTE AROSE IS NOT DEFENSE AVAILABLE AS AGAINST BONA FIDE PURCHASER.

Fraud in contract or in consideration out of which negotiable instrument arose is no defense available to maker in suit by bona fide holder.

3. BILLS AND NOTES—FRAUD IN PROCUREMENT NOT AVAILABLE AS DEFENSE AGAINST PURCHASER FOR VALUE BEFORE MATURITY, UNLESS KNOWLEDGE ACTUAL OR CONSTRUCTIVE IS ESTABLISHED.

For fraud in procurement of note to be available as defense against purchaser for value before maturity, under negotiable instrument act, sec. 56, it must appear purchaser had actual knowledge of fraud or of facts such that taking amounted to bad faith.

4. BILLS AND NOTES—PURCHASER OF NOTE HELD NOT SHOWN TO HAVE ACQUIRED IT WITH KNOWLEDGE OF FRAUD IN ITS PROCUREMENT.

Purchaser of note *held* not shown to have acquired it with knowledge of fraud in its procurement, particularly where makers themselves did not discover alleged fraud until over year after such purchase, and in meantime paid accruing interest.

5. BILLS AND NOTES—BONA FIDE HOLDER OF INSTRUMENT ARISING OUT OF ILLEGAL TRANSACTION IS UNAFFECTED THEREBY, SAVE PERHAPS WHERE STATUTE DECLARES INSTRUMENT VOID.

Bona fide holder for value of a negotiable instrument is unaffected by fact that it originated in illegal transaction, or was given for consideration made illegal by statute, unless

perhaps in cases where statute declares instrument absolutely void.

6. BILLS AND NOTES—RIGHTS OF BONA FIDE HOLDER NOT AFFECTED BY SUBSEQUENT RESCISSION BY MAKER OF CONTRACT OUT OF WHICH NOTE AROSE.

Rights of bona fide purchaser for value of note are not affected by maker's subsequent attempted rescission of contract out of which note arose, or by suits against payee to enforce such rescission.

7. BILLS AND NOTES—NOTE HELD COMPLETE AND REGULAR ON ITS FACE AS CONCERNS IDENTITY OF MAKER.

Note, signed "The Chiatovich Ranch, by J. M. Chiatovich," is as matter of law complete and regular on its face, and constitutes negotiable instrument so far as identity of maker is concerned.

8. BILLS AND NOTES—NOTE NEED NOT DISCLOSE IDENTITY OF MAKER WHETHER CORPORATION, PARTNERSHIP, OR INDIVIDUAL.

Note need not disclose exact identity or capacity of maker whether corporation, partnership, or individual, and failure to do so does not render it incomplete or irregular.

9. PARTNERSHIP—ACTS INDUCING GENERAL BELIEF IN PARTNERSHIP RELATION MAY RENDER PERSONS LIABLE AS PARTNERS.

Course of conduct, acts, and acquiescence in management of affairs, inducing belief that persons are acting as partners, may render them liable as such, though no partnership was intended.

10. PARTNERSHIP—PARTNERSHIP BY ESTOPPEL MAY ARISE BETWEEN HEIRS INTERESTED IN ESTATE, EVEN BEFORE FINAL DISTRIBUTION.

Persons interested as heirs in estate, by their acts and acquiescence in its management by one of their number, may become liable as partners on note executed by such person, though during whole time property involved belonged to the estate, in course of administration, and was under legal control of another as executrix.

11. PARTNERSHIP — EVIDENCE OF ACTS BOTH BEFORE AND AFTER TRANSACTION IN QUESTION ADMISSIBLE ON ISSUE OF PARTNERSHIP.

Proof that alleged partners acted as such both before and after date of transaction in issue is admissible in determining fact of partnership at that time.

12. PARTNERSHIP—EVIDENCE HELD SUFFICIENT TO GO TO JURY, AND SUSTAIN FINDING OF PARTNERSHIP BY ESTOPPEL.

Evidence of acts of alleged partnership *held* sufficient to go to jury, and sustain findings that partnership existed.

13. PARTNERSHIP—EXECUTRIX REFUSING TO SIGN NOTE MAY NEVERTHELESS BE LIABLE THEREON AS PARTNER BY ESTOPPEL.

That administratrix of estate refused to sign or authorize execution of note does not relieve her from liability thereon as partner by estoppel, where she has allowed herself to be held out as partner to payee and public at large.

14. PARTNERSHIP—PERSONS ENGAGED IN OPERATING RANCH AND STORE THEREON HELD LIABLE AS TRADING PARTNERSHIP.

Defendants engaged together in operating ranch and run-

ning store thereon *held* liable as trading partnership on note executed by one of its members, though part of their business was noncommercial.

15. INFANTS—GIRL 18 YEARS OLD AT TIME OF EXECUTION OF NOTE HELD CHARGEABLE THEREON AS PARTNER.

    Girl 18 years old at time of execution of note *held*, under Rev. Laws, sec. 431, chargeable as partner.

16. INFANTS—INFANCY IS PERSONAL DEFENSE WAIVED BY FAILURE TO INTERPOSE.

    Infancy is personal defense such that failure to interpose it amounts to waiver.

17. INFANTS—INFANT'S NOTE IS VOIDABLE, NOT VOID.

    Note of infant is voidable, not void, and may be ratified on attaining his majority.

18. INFANTS—FAILURE TO PLEAD INFANCY HELD IMPLIED RATIFICATION OF CODEFENDANT'S ACT IN MAKING NOTE SUED ON AVAILABLE TO PLAINTIFF AS WAIVER OF SUCH DEFENSE.

    Where one sought to be held on note as partner by estoppel was at time of execution of note a minor, *held*, her failure to plead infancy was an implied ratification of acts of her codefendants, and was available to plaintiff as waiver of such defense.

19. INFANTS—INFANT'S PARTNERSHIP AGREEMENT IS NOT VOID, BUT VOIDABLE ONLY.

    Infant's partnership agreement is not void, but voidable only.

20. INFANTS—RIGHT TO PLEAD INFANCY AS DEFENSE NOT LOST BECAUSE PARTY HAVING SUCH RIGHT IS SUED JOINTLY WITH OTHERS.

    Right to plead infancy as defense to action on note is not lost because one having such right is sued together with others liable.

21. PARTNERSHIP — DEFENDANTS HELD LIABLE ON NOTE, THOUGH SIGNED ONLY IN NAME OF FIRM UNDER WHICH THEY WERE DOING BUSINESS.

    Under negotiable instruments act, sec. 18, defendants *held* liable on note signed in firm name under which they were doing business.

22. BILLS AND NOTES—DEFENSE NOT PLEADED IN ANSWER HELD NOT AVAILABLE.

    That plaintiff, purchaser of note, on being notified of fraud in its procurement proceeded against payee, and obtained from him security, is not available as defense to action on note where not pleaded in answer.

---

See (1) 4 C. J. sec. 2834, p. 853, n. 58; (2, 3, 4, 5, 6, 7, 8) 8 C. J. sec. 197, p. 107, n. 20; sec. 206, p. 114, n. 25; sec. 706, p. 496, n. 75; sec. 1020, p. 748, n. 54; sec. 1033, p. 768, n. 26; sec. 1047, p. 788, n. 86; sec. 1270, p. 968, n. 35; sec. 1358, p. 1047, n. 10; (9, 10, 11, 12, 13, 14) 30 Cyc. p. 391, n. 82; p. 395, n. 97; p. 406, n. 77; p. 415, n. 28; p. 478, n. 53; p. 509, n. 93; p. 591, n. 21;

(15, 16, 17, 18, 19) 31 C. J. sec. 3, p. 987, n. 28 ; sec. 188, p. 1082, n. 33 ; sec. 193, p. 1085, n. 88 ; sec. 340, p. 1161, n. 41, 46.

APPEAL from Seventh Judicial District Court, Esmeralda County; *J. Emmett Walsh,* Judge.

Action by the W. M. Barnett Bank against J. M. Chiatovich and others, doing business as the Chiatovich Ranch. Judgment for plaintiff, and defendants appeal. **Affirmed.**

*I. S. Thompson* and *Forman & Forman,* for Appellants:

Fraud, inadequacy or failure of consideration is ground for rescission. 1 Black on Rescission of Contract, secs. 20, 157, 158, 172, 538.

Courts are never strict where injured party has been lulled into inaction by wrongdoers. 2 Black, pp. 1284–86.

Time does not commence to run until discovery of fraud. Limitation is three years. Rev. Laws, 4967.

If party has lien on two funds and another party has lien on one only, latter has right in equity to compel former to resort to other fund first. 1 Story Equity, sec. 633. If prior creditor resorts to doubly charged fund subsequent creditor will be substituted to his rights. Pomeroy Equity, sec. 1414.

It is not policy of law nor disposition of our courts to require our citizens to go to another state to collect, when court of equity can give visiting bank exact change. Officer of foreign court should not be permitted as against claims of resident creditors, to remove from this state assets of debtor. Hurd v. City of Elizabeth, 41 N. J. L. 1; Catlin v. Wilcox, 18 Am. St. Rep. 341.

Handwriting expert may testify to age of instrument. He is better qualified than mankind in general. Pub. Ald. & Putnam v. Hamilton, 140 N. W. 886; 22 C. J. 520; Jones, Evidence, sec. 367.

Defect on face of paper should excite suspicion. 7 Cyc. 949.

Transferee of fraudulent note must show he purchased in good faith. If partnership, all partners must

be ignorant of fraud. Darrow v. Blake, 13 N. W. 50; Bank v. Paddick, 57 N. W. 687.

Rigid rules of negotiable instrument law are relaxed to protect injured person from deliberate fraud. Willfully remaining ignorant or refraining from inquiry which would expose apparent defects in title to paper involves bad faith. Vaughan v. Johnson, 119 Pac. 881.

Partnership for purpose of working land is. nontrading, and general rule is that member has no implied authority to bind firm by execution of negotiable paper. 9 A. L. R. 372; McCrary v. Slaughter, 58 Ala. 230; Gordon v. Marburger, 187 Pac. 364.

"The Chiatovich Ranch" was not partnership, but simply piece of real estate in process of administration. Negotiable instrument act provides note shall have proper parties. The ranch is not party of this kind. Note was therefore not negotiable.

Purchaser of commercial paper takes with constructive notice of disability of parties. McClaim v. Davis, 77 Ind. 419.

Overdue interest should give notice of infirmity. Bank v. Co. Comrs. 14 Minn. 77.

Compound interest is illegal in Nevada. Cox v. Smith, 1 Nev. 161. As to such provision, note was invalid.

No person is liable on instrument whose name does not appear thereon. Neg. Ins. Law, sec. 18.

That Margaret Chiatovich was executrix of estate was matter of public record and notice to all that she had sole management. Rev. Laws, 1038–39.

Minor heir could not possibly have been partner, and her property was under care of guardian. There could not have been partnership consisting of all the heirs. Minor heir could not be bound by note in any event.

Negotiable instrument law has abrogated rule in Gillig, Mott & Co. v. Lake Bigler Road Co., 2 Nev. 214.

*H. H. Atkinson,* for Respondent:

All business of family had been conducted for several years, bank accounts were opened, mercantile business

conducted, money borrowed, and in fact all business conducted in name of The Chiatovich Ranch by J. M. Chiatovich. J. M. Chiatovich attended to all business of family, and they consented thereto. It is evident that defendants being at all times fully informed, operated independently of estate in farming, cattle and mercantile business, with J. M. being held out and actually acting as manager.

Lillian Chiatovich, once minor heir, was eighteen years old when note executed, and capable of contracting. Rev. Laws, 431, 6154.

Note providing for compound interest is not illegal, but is legal to extent of simple interest. Cox v. Smith, 1 Nev. 161.

Right of rescission is lost by failure to act promptly on discovery of fraud. 13 C. J. 616.

Bringing action on contract or endeavoring to enforce it is affirmance and will bar rescission. 13 C. J. 624; Elgin v. Snyder, 118 Pac. 280.

It is too late to rescind contract after suit had been brought to collect it by third party, who is bona fide purchaser before maturity. Buell v. Bank, 12 South. 29.

Bad faith, and not merely notice of circumstances sufficient to put prudent man on inquiry, is necessary to defeat recovery by holder whose right accrued before maturity. McPherin v. Tittle, 129 Pac. 721. Evidence of fraud on procuring note regular on its face is not sufficient to raise presumption of bad faith; purchaser in good faith is under no duty to inquire into consideration. Vaughan v. Johnson, 119 Pac. 879; Oppenheimer v. Bank, 56 A. S. R. 778.

Delay in payment does not necessarily constitute suspicious circumstance. Bank v. Lindsley, 158 Pac. 1082.

When negotiable paper is signed in name recognized by firm as its business name, courts are agreed it is properly executed. 30 Cyc. 509.

Firm may use assumed name. 8 Cyc. 219.

Whether intention of parties to become partners is question for jury. 39 Cyc. 594.

In commercial or trading partnership, each partner

has implied authority to issue negotiable paper in firm name.  20 R. C. L. 900; Rooney v. Buckland, 4 Nev. 45.

Burden is on defendant to show note was not issued for partnership purposes.  Davis v. Cook, 14 Nev. 265.

Where note shows party signing acts for another, parol testimony is admissible to bind principal.  Gillig, Mott and Co. v. Lake Bigler Road Co., 2 Nev. 214.

Whether notice is imputed from face of instrument is one of law for court.  Pittsburg Bank v. Neal (U. S.), 16 L. ed. 323; 8 C. J. par. 707.

Bank's good faith was so completely shown that question could have been withdrawn from jury and decided by court as matter of law.  McLaughlin v. Dopps, 147 Pac. 6; Angus v. Downs, 147 Pac. 630.

## OPINION

By the Court, DUCKER, C. J.:

The plaintiff is a corporation engaged in the banking business at the town of Wasco, State of Oregon, and brought this action against the defendants as the owner and holder of their promissory note.  It is alleged in the complaint, as amended, that:

"Before December 27, 1919, the plaintiff, for a valuable consideration, purchased said promissory note from H. B. Thornberry in the course of its business, and in good faith."

It is also alleged in the complaint that at all times and dates mentioned therein—

"The defendants were and are the joint owners of and operating in the farming and ranching business, and owning property under the name and style of the Chiatovich Ranch, situate in the State of Nevada, and that defendant J. M. Chiatovich at all times and dates mentioned was and is the manager of said Chiatovich Ranch."

The note sued upon is set out in the complaint as follows:

"$4,750.00.          Goldfield, Nevada, Dec. 27, 1917.

"Three years after date, without grace, for value

received, we jointly and severally promise to pay to H. B. Thornberry, or order, at ——— four thousand seven hundred and fifty and no/100 dollars, with interest from date until paid, at the rate of seven per cent per annum, said interest to be paid semiannually, and if not as it becomes due, to be added to the principal and become a part thereof, and bear interest at the same rate, but if default be made in the payment of interest as above provided, then this note shall immediately became due at the option of the holder thereof: We jointly or severally promise to pay 10% of the face of this note as attorney fees and costs should suit be brought to collect this note or any portion thereof. All payments are to be in United States gold coin.

"[Signed]    The Chiatovich Ranch,
"By J. M. Chiatovich."

The defendants J. M. Chiatovich and W. M. (Marco) Chiatovich filed a joint answer to the complaint, and the defendants Margaret Chiatovich and Lillian Chiatovich also filed a joint answer. In substance the answers set up matters to show that the defendant J. M. Chiatovich was without authority to execute the note as binding upon the other defendants; that it was procured through the fraud of said Thornberry; that the plaintiff had knowledge of such fraud long prior to acquiring said note and knowledge of the facts which deprived said J. M. Chiatovich of authority to execute it, and that plaintiff is therefore not a bona fide owner of the same in good faith; that said Thornberry is still the real owner of the note, and plaintiff is simply acting as the agent or collector of said Thornberry, in the institution of this suit and suits on ten other promissory notes belonging to him; that any alleged assignment or transfer of said note to plaintiff was made long after the 27th day of December, 1920, and after the maturity of said note and without any consideration whatever; and that Thornberry is well able to pay and satisfy the said note.

The case was tried before a jury, which rendered a verdict in favor of plaintiff for the full amount sued for, upon which judgment was rendered in the amount of

$6,130.42, with interest upon the principal of the note at the rate of 7 per cent per annum from date until paid, and costs. From the judgment and order of the court denying their motion for a new trial, the defendants have appealed.

A brief statement of the main facts out of which this controversy arose is necessary. On March 11, 1907, John Chiatovich died testate, leaving his entire property situated in Esmeralda County, Nevada, consisting of real estate and the improvements thereon, personal property consisting of live stock and farming implements, and goods, wares, and merchandise in a store at Silver Peak in said county, share and share alike to his five children, Martin Chiatovich, John Chiatovich, Marco Chiatovich, Cecil Chiatovich, and Lillian Chiatovich, all minors. By the terms of the will the widow, Margaret Chiatovich, and C. E. Mack were made executrix and executor of the estate. The will was admitted to probate, and the said widow and C. E. Mack were duly appointed and qualified as such executrix and executor. By the terms of the will Margaret Chiatovich was nominated and appointed guardian of the minor children, and given sole management of the estate for the benefit of herself and the children. She was appointed by the court, and qualified as such guardian. On the 6th day of January, 1919, Martin Chiatovich conveyed his interest in the property devised by the father to Margaret Chiatovich and John M. Chiatovich. On January 29, 1919, a decree of distribution was entered by which the property was distributed to John M. Chiatovich, Marco Chiatovich, Lillian Chiatovich, and Cecil Chiatovich, subject to an agreement made in September, 1916, by which Cecil Chiatovich agreed to sell his entire interest to John Chiatovich and Marco Chiatovich. On January 6, 1919, all of the children being then above the age of majority, said Margaret Chiatovich was discharged from her trust.

All of the children were born while the father and mother were living on the ranch, and were working there at the time of the trial, and had worked for their

father and mother on the ranch from the time they were old enough to do so. The ranch was commonly known and called "the Chiatovich Ranch," and the business conducted was ranching and raising and selling live stock. In connection with the business a store was conducted on the ranch, for the sale of goods, wares, and merchandise. Letters in the transaction of business were written on stationery under the following letterhead:

"The Chiatovich Ranch, Dealers in Groceries, Hardware, Boots and Shoes, Men's Clothing, Field and Garden Seeds, Gasoline and Oils, Growers of Alfalfa and Timothy Hay, Barley, Wheat, Oats, Corn, Potatoes and Live Stock. Railroad Station, Coaldale, Nevada."

On June 4, 1917, J. M. Chiatovich and W. M. Chiatovich, known as Marco Chiatovich, entered into a contract with one H. B. Thornberry for the purchase of a jack named Hackman, for the sum of $3,500, wherein said Thornberry agreed that if the jack did not get 50 per cent of producing mares with foal he would replace him with another jack of the same breed and price. The jack was delivered at Bishop, Cal., on the date of the contract, and purchased and shipped to the Chiatovich Ranch on the 7th or 8th of June, 1917. The jack Hackman proved unsatisfactory in failing to produce according to contract, and on or about June 10, 1919, Thornberry replaced him with a jack named Wild Irishman. Three notes, amounting in all to $3,500, were given to Thornberry in payment for the former jack, payable on June 4, 1918, 1919, and 1920, respectively, which notes were all paid at maturity. The last note was paid out of the funds in the Chiatovich Ranch account with the Tonopah Banking Corporation in Tonopah, Nevada. On December 27, 1917, at Goldfield, Nevada, the Chiatovich Ranch by and through J. M. Chiatovich entered into a contract with said Thornberry for the purchase from him of 15 head of registered and pedigreed jennets to be delivered at Coaldale, Nevada, within 60 or 90 days from date of contract. It was

agreed by Thornberry that the jennets should be of certain specifications, and registered in either the Standard Jack and Jennet Register of Kansas City, Mo., or in the American Breeder's Association of Jacks and Jennets of Columbia, Tenn. The jennets were to be paid for by three notes: One for $2,000, due in one year; one for $3,000, due in .two years; and one for $4,750, due in three years. The contract in respect to the notes was modified so that one note for $5,000 payable in two years was given instead of two notes for $2,000 and $3,000. The notes for $5,000 and $4,750 were executed and delivered to Thornberry on December 27, 1917, before the delivery of the jennets. They were signed, "The Chiatovich Ranch, by J. M. Chiatovich."

The note for $5,000 was paid to Thornberry when it became due out of the Chiatovich Ranch account with the Tonopah Banking Corporation by check drawn by J. M. Chiatovich. This action was instituted upon the note for $4,750 as previously stated.

In October, 1919, the plaintiff purchased from Thornberry the note in question, with a number of others, for the sum of $14,573.75. The Chiatovich note was purchased at a discount of 5 per cent. The amount was placed to Thornberry's credit in the plaintiff bank, and was checked out by him prior to December 5, 1919. On December 5, 1919, there was an overdraft of $1,430.59, which was covered the next day. On January 23, 1920, the sum of $332.50, interest on the note to December 27, 1919, was paid to the plaintiff. The letter with which the check for payment of interest was inclosed was signed "The Chiatovich Ranch, by J. M. Chiatovich." By letter of date December 20, 1920, addressed to J. M. Chiatovich, the Chiatovich Ranch, the plaintiff bank through its cashier informed him that the note would be due on December 27, 1920, and that payment thereof would be expected at that time. This letter was replied to by I. S. Thompson, an attorney at law of Tonopah, Nevada, in which he stated in substance that the note was given in part payment for 15 jennets sold by Thornberry to the Chiatovich people; that within

the last 30 days the Chiatoviches had discovered that many of the representations made by Thornberry to induce them to buy were untrue; that the jennets were not standard bred or pedigreed, and were of no value whatever; that as soon as the Chiatoviches had discovered that they had been cheated and defrauded they served upon Thornberry in Spokane, Wash., a written rescission and notice of rescission of the contract and purchase, and offered to return to him all of the jennets; all of the offspring and everything they had received from him and demanded from him the surrender and cancellation of said note and the return of all money paid. The writer suggested that the plaintiff find some courteous way in which to return the note to Thornberry so that the defense of the Chiatoviches could be made against him, and not against the bank. The plaintiff bank, through its cashier, replied to the attorney, in which reply it was stated that the bank was an innocent purchaser for value, and asked payment in full, with interest, suggesting that the Chiatoviches take up the matter of the contract directly with Thornberry. The written rescission and notice of rescission referred to in the attorney's letter to the plaintiff bank was signed, "The Chiatovich Ranch, by J. M. Chiatovich," and served on Thornberry at Spokane, Wash., on the 27th of November, 1920.

In December, 1920, and after said notice of rescission, J. M. Chiatovich and W. M. Chiatovich filed a suit against Thornberry in the district court of Esmeralda County, in which was sought a decree requiring among other things that Thornberry accept said jacks and jennets from said Chiatoviches and return to them the said note for $4,750 still unpaid, for cancellation, and pay back all moneys that had been paid to him upon the purchase of said jacks and jennets, and pay the sum of $6,000, the amount of loss caused by the failure to breed 45 head of mares belonging to the Chiatoviches. A similar suit for rescission was commenced against Thornberry by the same parties in the District Court of the United States for the Eastern District of Washington, which suit is still pending.

After the plaintiff bank had been notified by the defendants through their attorney that a fraud had been committed upon them by Thornberry, a suit was brought against him by plaintiff on the note in question and 11 others, and property belonging to him in Oregon was attached. This suit was dismissed, and the attachment released; Thornberry giving the plaintiff a mortgage upon his real estate to secure said notes. Such other facts as may be necessary will be mentioned during the course of this opinion.

The defendants make a number of contentions as to the right of the plaintiff to recover upon the note, the most of which can be resolved into the following proposition: Is the note a negotiable instrument complete and regular on its face and sufficient to bind all of the defendants? Is the plaintiff an innocent purchaser in good faith for value before maturity? Both of these contentions must be answered in the affirmative.

1. The purchase was made by the plaintiff bank from Thornberry in October, 1919, more than a year before maturity, as heretofore mentioned in the statement of fact. The circumstances surrounding the purchase of the note, as testified to by the president of the plaintiff bank, point to its good faith in the transaction. The testimony was not contradicted in any way. The circumstances in evidence pointed out by counsel for defendants in his brief, and claimed by him to indicate the bad faith of plaintiff in the transaction, were for the jury, and resolved against defendants by the verdict in the case. As there was ample evidence to justify the jury in concluding for plaintiff on the bona fides of the transaction, the verdict is conclusive in this respect.

Defendants contend that the note is void by reason of fraudulent representations claimed to have been made by Thornberry to J. M. and W. M. Chiatovich, respecting the pedigree and breeding of the jacks and jennets sold by him to the Chiatoviches under the contracts mentioned, and as to the number and quality of foal said jacks and jennets would produce if properly handled. The two Chiatovich brothers testified to matters tending

to support the allegations of their answer in this regard, and other testimony to the same effect was given.

2, 3. The effect of Thornberry's fraud in obtaining the note in question, upon plaintiff as its holder, if in fact he committed any fraud, was submitted to the jury by proper instructions. The general rule is that fraud in a contract, or in the consideration out of which a negotiable instrument arose, is no defense in favor of the maker as against a bona fide holder. This rule is elementary in the law merchant, and is embodied in our law concerning negotiable instruments. Before Thornberry's fraud could be held to impeach the note in plaintiff's hands, it must appear that plaintiff had actual knowledge of the fraud or knowledge of such facts in connection therewith that the taking of the note amounted to bad faith. Section 56 of the negotiable instrument act (Rev. Laws, sec. 2603), reads:

"To constitute notice of an infirmity in the instrument or defect in the title of the person negotiating the same, the person to whom it is negotiated must have had actual knowledge of the infirmity or defect, or knowledge of such facts that his action in taking the instrument amounted to bad faith."

4. This provision and others concerning the right of the holder of a negotiable instrument were given to the jury in instructions. Upon this phase of the case the evidence seems to be conclusive that, prior to the purchase of the note, the plaintiff had no knowledge of the fraud claimed to have been committed by Thornberry. Indeed, the defendants claim and allege in their answer that they did not discover that Thornberry's representations were false, and that they had a right to rescind the agreement until on or about November 10, 1920. This was over a year after the note had been negotiated to the plaintiff bank. If defendants did not know that they had been defrauded at the time of the transfer, it is difficult to perceive how the plaintiff would know it unless knowledge was imparted to it by Thornberry at the time or prior to the transfer. There is no evidence

to this effect. The allegation in the answer as to the nondiscovery of the falsity of Thornberry's representations as to the pedigree and breeding of the animals is supported by the fact that on January 23, 1920, interest on the note was paid to the plaintiff by the Chiatovich Ranch, by J. M. Chiatovich, which was three months after the transfer of the note.

But it is contended that the note is absolutely void on account of certain statutes of this state. In this connection we are referred to section 6746 of the Revised Laws of this state, which reads, in part:

" * * * Every person who shall knowingly represent an animal or bird for breeding purposes to be of a greater degree of any particular strain of blood than such animal actually possesses, shall be guilty of a gross misdemeanor."

And to section 6 of Statutes of 1913, p. 290, which reads as follows:

"Every person, firm, or company, importing any stallion or jack into the State of Nevada, for breeding purposes or sale, shall first secure a certificate from a recognized state or federal veterinary office, certifying that said stallion or jack is free from any or all diseases or unsoundness referred to in section 4 of this act. A copy of the certificate must be mailed to the secretary of the stallion registration board at the University of Nevada, Reno, Nevada, at least five days before the importation of the stallion or jack into the state. No stallion or jack that is neither pure-bred nor grade according to the meaning of this act shall be imported into the state for breeding purposes."

While the latter act was in force at the time of the making of the contract concerning the jack, it may not be amiss to point out that this act was repealed by the last legislature. Stats. 1923, p. 11. However, the jack was not imported into this state by Thornberry contrary to the provisions of this statute, but was delivered to the Chiatoviches at Bishop, Cal. But in considering the contention based on these statutes we lay out of view

all facts concerning the contract for the jack, for the
reason that that was an independent transaction. The
notes connected with that contract were all paid to
Thornberry. The note in question, as we have seen,
was given in part payment for the jennets. Jennets are
unquestionably embraced within the provisions of sec-
tion 6746, and, conceding that Thornberry represented
them to be of greater degree of a particular strain of
blood than the animals possessed, how does this affect
the note transferred by him to plaintiff? Counsel for
defendants have favored us with no citation of authority
in this respect, but have passed the subject to us for
our own thought and research. The statute merely
prohibits the making of the false representation men-
tioned, and prescribes a penalty for its violation. It
does not declare that contracts made in violation of its
provisions shall be void, nor is there any language in it
necessarily implying that the legislature intended such
contracts should be deemed void.

5. The general rule as to the right of a bona fide
holder of a negotiable instrument given for a considera-
tion made illegal by statute, is, we believe, correctly
stated by Mr. Daniels in his work on Negotiable Instru-
ments. He says:

" * * * The bona fide holder for value who has
received the paper in the usual course of business is
unaffected by the fact that it originated in an illegal
consideration, without any distinction between cases of
illegality founded in moral crime or turpitude, which
are termed mala in se, and those founded in positive
statutory prohibition which are termed mala prohibita.
The law extends this peculiar protection to negotiable
instruments, because it would seriously embarrass
mercantile transactions to expose the trader to the con-
sequences of having the bill or note passed to him
impeached for some covert defect. There is, however,
one exception to this rule—that when a statute,
expressly or by necessary implication, declares the
instrument absolutely void, it gathers no vitality by its
circulation in respect to the parties executing it."
1 Daniel on Negotiable Instruments, sec. 197 (2).

See, also, Story on Promissory Notes, sec. 192.

There is some conflict in the authorities as to the exception stated in the above text, some holding that a note, the consideration of which is formed by a contract or transaction declared illegal by statute, is not void as against a holder for value without notice, unless the statute declares the note itself void; while others hold that the note is void, not only between the parties to it, but also as to such holder, if the contract or transaction which forms the consideration of the note is declared void by statute.

But in determining the question before us we are not concerned with the difference of judicial opinion as to the exception to the general rule. While there are authorities to the contrary, the general rule is well established. In 3 R. C. L. p. 1018, it is stated:

"The prevailing view seems to be that, if the law merely declares illegal and forbids the acts and transactions giving rise to a bill or note, the instrument will not be held void in the hands of a holder in due course."

See 8 C. J. pars. 1032 and 1033.

We think this view is sound. The statute in question does not take the note on which judgment was recovered out of the general rule. It does not declare contracts made or transactions had in violation of its provisions, or notes representing the consideration thereof, void, either expressly or by necessary implication. It merely prohibits the making of the false representations mentioned, and makes violation of its provisions a gross misdemeanor. This does not affect the plaintiff as a holder in due course.

6. Defendant's counsel place great stress upon the written rescission and notice of rescission served on Thornberry, and on the suits brought against him to enforce rescission, but these facts cannot aid them if plaintiff is a holder of the note in due course. The law quoted by defendant's counsel in their brief has reference to the right of rescission as between parties to a fraudulent contract. Whatever effect their rescission of the contract may have had as against the payee of the note, if it had not been transferred by him, is of no

consequence here, and the jury was correctly instructed as to the effect of rescission as against a holder in due course.

7-9. The argument that the note is not a negotiable instrument, and is incomplete and irregular on its face, takes a very wide range. We think, however, it may be summed up in the proposition that the note has no maker for the reason that the Chiatovich Ranch is not an entity, and J. M. Chiatovich has no authority to execute a note in behalf of the other defendants. On the other hand, plaintiff maintains that the defendants, by a long course of dealing with the property of the estate and its proceeds, became partners, and the partnership thus made was commonly known as the Chiatovich Ranch, with J. M. Chiatovich as general manager. The court instructed the jury that as a matter of law the note by "the Chiatovich Ranch, by J. M. Chiatovich" in this action is complete and regular upon its face, and is a "negotiable instrument." There was no error in giving this instruction. The note presents all the requisites of a negotiable instrument. True, the exact identity of the maker, whether corporation, partnership, or individual, is not disclosed, but that does not make it incomplete or irregular. If that were so, then a great mass of negotiable instruments purporting to be executed by an agent would be defective because of the character of the maker, whether a corporation, firm, or individual, was not revealed on the face of the note. The identity of the maker may always be established by the evidence. Under the circumstances of this case the identity of the maker, and whether J. M. Chiatovich had authority to execute the note in its name, binding upon all the other defendants, depends upon whether there was sufficient legal evidence to warrant the jury in finding that they were partners, or conducted themselves in a manner calculated to lead other people to believe that they were partners doing business as the Chiatovich Ranch. Our inquiry on this point may not extend further. The defendants may never have intended to be partners in the property of the estate,

and still their acts and acquiescence in the management thereof may have been sufficient to induce a general belief that they were, and render them liable to any one acting upon the assumption that they were such partners. This doctrine, says Mr. Lindley in his work on Partnerships, "is nothing more than an illustration of the general principle of estoppel by contract."

10. Counsel for defendants place great stress upon the facts that during all of the transactions with Thornberry, including the execution of the note, the property belonging to the estate of John Chiatovich had not been distributed to the defendants, but was in the course of administration, and that Margaret Chiatovich was the executrix of the estate, all of which was a matter of public record. These facts could not operate as a matter of law to prevent the defendants from so acting with reference to the affairs of the estate as to render themselves liable as partners to third parties; nor can we see what bearing they have as evidence upon the point. The action is not against the estate; consequently, what action of the executrix, or orders of the court, would be necessary to charge the estate, are beside the question.

It will be unnecessary to review the evidence, except in so far as to point out what we think is sufficient to warrant the conclusion that, before and after the transaction with Thornberry which resulted in the execution of the note, the defendants conducted themselves with reference to the affairs of the estate as partners doing business as the Chiatovich Ranch, with J. M. Chiatovich in the active management thereof. Margaret Chiatovich was appointed executrix in 1907, and was discharged as such March 5, 1919. In the meantime the defendants resided on the ranch, and contributed their joint efforts to carrying on its business, which consisted generally of cultivating lands, raising and selling crops, raising and selling and buying live stock, and conducting a store on the premises. For the purposes of advertising their business generally they adopted and used stationery with an elaborate letterhead as heretofore

set out in the statement of facts, showing them to be doing business under the firm name of "the Chiatovich Ranch."

The evidence shows that the business of the Chiatovich ranch was maintained by the defendants as a going concern both before and after the property belonging to the estate had been distributed, and that J. M. Chiatovich was managing it, at least as to its financial affairs. They opened an account with the John S. Cook Company Bank at Goldfield, August 2, 1916, which was still being carried on at the time of the trial. The account stood in the name of the Chiatovich Ranch. The money deposited in the bank to this account came from the sale of the produce of the ranch, and was drawn out and used by the defendants as their necessities required. Such moneys could be drawn out only on authority of J. M. Chiatovich by check signed "The Chiatovich Ranch, by J. M. Chiatovich." An account was opened with the Tonopah Banking Corporation at Tonopah, Nevada, in January, 1920, in the name of the Chiatovich Ranch. Money could be drawn out of this account only by check signed "The Chiatovich Ranch, by J. M. Chiatovich." The money which supplied this account came from the same sources as that of the former bank account, that is from the sale of ranching products, live stock, and merchandise. In addition the members of the Chiatovich family borrowed money from the Tonopah Banking Corporation which was deposited in this account subject to check as aforesaid. The money drawn out of this account was used for the benefit of the defendants. A similar account on which only J. M. Chiatovich had authority to draw checks as on the other banks was opened with the Wells Fargo Bank of San Francisco. The moneys supplying this account came from the same sources, and were drawn out, and were used for the purposes of the defendants.

The three notes given in payment for the jack Hackman, amounting to $3,500, were paid out of the Chiatovich Ranch account by J. M. Chiatovich in 1918, 1919, and 1920. The last one was paid out of the account

with the Tonopah Banking Corporation. The note of $5,000 given in part payment for the jennets was paid December 27, 1919, out of the funds with the Tonopah Banking Corporation, and the interest due December 27, 1919, on the note in question, paid to plaintiff out of funds in the John S. Cook Company Bank at Goldfield. All of these sums were paid by check drawn by the Chiatovich Ranch, by J. M. Chiatovich.

11. Beginning with the year 1914, J. M. Chiatovich transacted all business with the assessor of Esmeralda County, relative to the assessment of the Chiatovich property. It is true some of these transactions transpired after the execution of the suit note, but they were pertinent to be considered as a continuation of the manner in which the defendants were doing business before its execution. Proof that alleged partners acted as such before and after the date of a note is proper evidence to be left to the jury in determining the fact of partnership at that time. Gilbert v. Whidden, 20 Me. 367. The evidence is conclusive that the receipts from the sale of the products of the ranch and the operation of the store went into funds in the different banks, which were used for the benefit of all the defendants, and for the expenses incurred in conducting the business. That the John S. Cook Company Bank at Goldfield and the Tonopah Banking Corporation at Tonopah regarded the defendants as acting together in business affairs under the name of the Chiatovich Ranch, independently of the Chiatovich estate is evident from letters from these institutions, written in response to inquiries as to the financial standing of the defendants made by the plaintiff.

On January 27, 1920, the former bank wrote to plaintiff:

"We are pleased to advise, however, that they [Chiatovich Ranch] have maintained a very satisfactory account with us for some years and in the past we have been pleased to loan on their paper."

The latter bank on February 5, 1920, wrote:

"We * * * beg to advise that the Chiatovich

Ranch carries an account with us. We consider their property a valuable one with very little indebtedness against it. We further consider that it is ably managed by J. M. Chiatovich, whom we consider responsible, either individually or for the firm."

12, 13. It will be seen from this that the Tonopah Banking Corporation regarded the Chiatovich Ranch as a firm, and J. M. Chiatovich as the actual manager. There was, in our opinion, sufficient legal evidence to go to the jury tending to show that at the time, and before the execution of the note on which this action was brought, the defendants held themselves out as partners independently of the Chiatovich estate, doing business as the Chiatovich Ranch, and that J. M. Chiatovich was held out as manager. His action therefore, in executing the note, bound all of the defendants. His evidence and that of his brother, W. M. Chiatovich, to the effect that the defendants were not conducting business as partners; that everything done was under the management of Margaret Chiatovich as executrix of the estate, and subject to her orders; and that she refused to sign or sanction the signing of the note, was resolved against the defendants by the jury. The evidence that she refused to sign the note and to authorize its execution is uncontradicted, but this does not relieve her from liability in the face of the verdict and evidence which tends to show that she allowed herself to be held out to the payee of the note, and the public at large, as a partner in the Chiatovich Ranch. The authorities are uniform in holding that one is charged with liability as a partner where he represents himself as such, or has permitted himself to be held out as such, to the extent of inducing others to believe, and to extend credit upon the belief that he is a partner. Story on Partnership (7th ed.), p. 103, and cases cited in note 2; Lindley on Partnership (2d ed.), vol. 1, pp. 39–42.

The question of J. M. Chiatovich's authority to execute the note as binding upon all of the defendants was submitted to the jury under proper instructions.

14. It is contended by defendants that, even though

a partnership existed between them at the time of the execution of the note, it is not negotiable, for the reason that it is not a trading partnership. If the defendants were engaged in farming and stock raising only this might be true, unless the authority of J. M. Chiatovich to execute negotiable paper was expressly given by the others, or implied from their general business habits, or subsequently ratified by them. Whether there was such authority or ratification in this case we need not determine, for the defendants were in the mercantile business as well as in the ranching business.

In Kimbro & Bullitt v. Kimbro, 22 How. 256, 16 L. Ed. 313, it was held that a bill drawn by a partner in the name of a firm engaged in farming, working a steam sawmill, and in trading, was binding. The cases cited by defendants from 9 A. L. R. 372, in support of their contention, are cases in which strictly nontrading or noncommercial partnerships were involved, with the exception of Hunt v. Chapin (1872), 6 Lans. (N. Y.) 139. In that case the defendant was in partnership with another in the mercantile business, and in conducting a cotton plantation. But it appears that the two partnerships were carried on by a separate and distinct agreement. No such agreement appears here. The mercantile business was carried on generally with the other business of the defendants. This, we think, was sufficient to clothe the defendants with all the implied powers of a trading corporation.

**15-17.** It is urged that act of J. M. Chiatovich in executing the note could not bind Lillian Chiatovich. The argument in this respect is that she was under age during the time it is claimed that defendants acted as partners, and her estate under the care and management of a guardian; that the guardian had not been discharged at the time of the execution of the note; and that she was therefore incapable of becoming a partner with the other defendants or holding herself out as such. Lillian Chiatovich was 8 years of age when the application for guardianship was made by her mother, Margaret Chiatovich, in April, 1907. She was therefore

18 years of age when the note was executed in December, 1917, of legal age, and capable of entering into a contract. Section 431, Rev. Laws 1912. However, Lillian Chiatovich was of legal age when the guardian was discharged, and when this action was instituted against her and the other defendants. She filed an answer, and in her answer did not interpose the defense of infancy. Consequently, it must be deemed waived. The plea of infancy is a personal defense, which, after coming of age, one may or may not interpose. The general doctrine is that the note of an infant is voidable, not void, and may be ratified after he comes of age. Goodsell v. Myers, 3 Wend. (N. Y.) 479; Conn v. Coburn, 7 N. H. 368, 26 Am. Dec. 746. As stated in 14 R. C. L. 294:

"If the defendant were of age when sued his failure to plead his infancy at the time of the contract would clearly be a waiver and implied ratification."

**18, 19.** But it is insisted that, as Lillian Chiatovich did not sign the note, her failure to plead her infancy cannot avail plaintiff, for the reason that plaintiff relies upon a holding out of partnership by the defendants under the name of the Chiatovich Ranch to establish her liability on the note, which she was incapable of doing when she was under age, and her estate under the care and management of a guardian. We see no merit to this contention. An infant may be a partner, and his agreement as such is not void, but voidable only. 1 Lindley on Partnership, pp. 74, 75; 14 R. C. L. 228; Dunton v. Brown, 31 Mich. 182; Osburn v. Farr, 42 Mich. 134, 3 N. W. 299.

As a general rule he may, before he becomes of age, or within a reasonable time thereafter, avoid liability for partnership debts by disaffirming past transactions. Mr. Lindley, in his work on Partnership says:

"A person who, before he comes of age, represents himself as a partner, must, when he comes of age, take care to notify that he has ceased to be a partner, if he desires to avoid liability." 1 Lindley on Partnership, p. 76.

**20.** There can be no difference in principle as to one who has permitted himself to be held out as a partner. Lillian Chiatovich not only did not disaffirm any of the acts of J. M. Chiatovich during her minority, but after she attained the age of majority did not disaffirm his acts in paying the notes in the jack Hackman transaction, the $5,000 note on the jennet transaction, and the interest on the suit note. It is unnecessary to determine whether this amounted to a ratification or not, for we hold that her failure to plead her infancy is an implied ratification of everything that was done by the other defendants doing business as the Chiatovich Ranch. The fact that Lillian Chiatovich and the other defendants were sued together could not deprive her of her right to plead her infancy as a defense. Cutts v. Gordon, 13 Me. 474, 29 Am. Dec. 520.

**21.** It is insisted that the defendants are not liable on the note because it is not signed by them, and we are referred to section 18 of the negotiable instrument act (Rev. Laws, sec. 2565) in support of this contention. That section reads:

"No person is liable on the instrument whose signature does not appear thereon, except as herein otherwise expressly provided. But one who signs in a trade or assumed name will be liable to the same extent as if he had signed in his own name."

The contention, if granted, would present a startling innovation in the law merchant, but it cannot be granted. The firm name under which the defendants were doing business appears on the note, and purports to have been placed there by one of the copartners. The word "person" employed in said section "includes a body of persons whether incorporated or not." Section 191, Negotiable Instrument Act.

**22.** On the 18th of December, 1920, plaintiff was notified by a letter from defendant's attorney that fraud had been committed by Thornberry in securing the note. Thereafter plaintiff commenced a suit against Thornberry in Sherman County, Ore., to secure the amount due on 12 promissory notes, among which was the

note in question. Later, on the 21st day of February, 1912, said suit was dismissed, and the attachment upon Thornberry's property released, the plaintiff having obtained security from him by mortgage on his property in that county. It is claimed by defendants that, plaintiff having received such notice and taking advantage of the information to obtain security for the note from Thornberry, this action cannot be maintained, but that the plaintiff must exhaust its remedy against Thornberry on the security, before the defendants can be compelled to respond in payments as makers of the note. It is sufficient to say in respect to this contention that the matters claimed as a defense were not set up in any of the answers of the defendants.

We have considered all of the other numerous assignments of error, and find them to be without merit. At least there is no error in record of a substantial sort.

The judgment is therefore affirmed.