GROSFIELD, APPELLANT, *v.* FIRST NATIONAL BANK OF MILES CITY, RESPONDENT.

(No. 5,618.)

(Submitted March 24, 1925. Decided April 22, 1925.)

[236 Pac. 250.]

*Conversion—Banks and Banking — Coupon and Registered Liberty Bonds — Nature of Instruments — Judicial Notice— Holder in Due Course — Corporations—Knowledge of Officers—When Imputable to Corporation, When not—Expert Witnesses—Jury not Bound by Testimony.*

Conversion—Liberty Bonds—Assignment—Transfer in Blank—Banks and Banking—Custom—Evidence—Admissibility.
 1.  In an action for the conversion of Liberty bonds, an officer of defendant bank to which the bonds had been delivered as collateral by another bank was properly permitted to testify that it was a custom of banks not to insert the name of the assignee but to have it

transferred in blank, though such custom had not been specially pleaded.

Same—Banks and Banking—Certificate of Deposit—Renewals—Evidence—Admissibility.

2.   Defendant bank to which stolen Liberty bonds had been pledged by another bank as security for the latter's indebtedness represented by a certificate of deposit was properly permitted to introduce in evidence two of a series of renewals of the original certificate as exhibits, each renewal representing the same indebtedness in another form.

Liberty and Victory Loan Bonds—Contents—Judicial Notice.

3.   Under section 10532, Revised Codes of 1921, courts take judicial notice of the form and contents of the Third and Fourth Liberty bond issues and of Victory Loan bonds.

Same—Coupon Bonds — Negotiable Instruments — Registered Bonds not Negotiable.

4.   A coupon Liberty bond is in effect a promissory note of the United States, payable to bearer, the interest upon which is represented by negotiable coupons attached thereto, title to which passes by delivery, and hence is subject to the provisions of the Negotiable Instruments Act, while a registered bond is not negotiable.

Conversion—Liberty Bonds—Nature of Bonds—Question for Jury, When.

5.   Where the owner of Liberty bonds which had been stolen from his safety deposit box testified that the interest on them was sent to him from Washington, thus indicating that they were registered bonds, and the cashier of the bank to which they had been sent as collateral and sold stated they were coupon bonds, the matter of determining their nature was one for the jury.

Same—Coupon Liberty Bonds—Holder in Due Course—Burden of Proof.

6.   To defeat the claim of ownership of coupon Liberty bonds, negotiable in character, asserted by plaintiff in his action for their conversion, it was incumbent upon defendant bank to show that it was a holder in due course, under sections 8459, 8465 and 8466, Revised Codes.

Same—Bonds Stolen from Safety Deposit Box—President of Bank Chargeable With Notice of Infirmity of Bank's Title to Bonds.

7.   A president of a bank who was also one of its directors was, as such, chargeable with constructive notice of the infirmity of the bank's title to bonds abstracted from the safety deposit box of one of its customers and deposited by it with another bank as collateral.

Corporations—When Knowledge of Officer not Imputable to Corporation.

8.   Knowledge acquired by an officer of a corporation while acting, not in behalf of the corporation but for himself or in a manner antagonistic to the corporation, is not imputable to it.

Conversion—Defendant Bank not Chargeable With Notice of Knowledge of Its Vice-president, When.

9.   Under the rule above (par. 8), *held* that where the president of a bank, which had deposited bonds taken from the safety deposit

---

7.   Knowledge of corporation as imputable to officer, see note in **Ann. Cas.** 1915A, 855.   See, also, 7 R. C. L. 658.

8.   Imputability to corporation of notice to officer engaged in independent act in own interest, notes, 6 **Ann. Cas.** 679; **Ann. Cas.** 1912C, 295; **Ann. Cas.** 1916B, 328.   See, also, 7 R. C. L. 657.

box of one of its customers, was also the vice-president of a bank to which they were forwarded as collateral, but took no part in the conduct of the latter's business, the receiving bank was not chargeable with notice of the knowledge imputable to him.

Same—Stolen Coupon Liberty Bonds—Sale as Collateral—Burden on Defendant—Directed Verdict—Error.
10.    The burden of showing lack of knowledge that coupon Liberty bonds which had been stolen was upon defendant bank, which had accepted and sold them as collateral, and the question whether it had sustained that burden was, under the evidence, one for the jury's determination, and therefore the court erred in directing a verdict for defendant.

Same—Stolen Registered Bonds—Title of Bank Accepting Them as Collateral.
11.    Since registered Liberty bonds are non-negotiable and a thief acquires no title to stolen property, a bank which had accepted such bonds (stolen from a safety deposit box of the bank which sent them as collateral) and thereafter sold them, acquired no better title than the taker had.

· Evidence—Handwriting Experts—Jury not Bound by Testimony.
12.    The jury is not bound by the testimony of experts on handwriting any further than it coincides with their opinion gathered from all the circumstances and by an examination of the writing; and the court in directing a verdict and thus in effect instructing the jury that they must accept such testimony as true committed error.

Bills and Notes, 8 C. J., sec. 577, p. 391, n. 81; sec. 716, p. 508, n. 69 New; sec. 1052, p. 797, n. 41; sec. 1291, p. 983, n. 45; p. 984, n. 50 New; sec. 1376, p. 1061, n. 61.
Corporations, 14 C. J., sec. 2356, p. 488, n. 33; sec. 2358, p. 490, n. 50; sec. 2359, p. 491, n. 60.
Customs and Usages, 17 C. J., sec. 80, p. 516, n. 95.
Evidence, 22 C. J., sec. 828, p. 738, n. 78; 23 C. J., sec. 1899, p. 100, n. 68.; sec. 1947, p. 128, n. 89.
Trial, 38 Cyc., p. 2078, n. 83.
Trover and Conversion, 38 Cyc., p. 2078, n. 83; p. 2105, n. 35.

*Appeal from District Court, Rosebud County; Geo. A. Horkan, Judge.*

ACTION by Ben Grosfield against the First National Bank of Miles City and two others. Judgment for defendant named and plaintiff appeals. Reversed and remanded for further proceedings.

12.    See 11 R. C. L. 622.

*Messrs. Grimstad & Brown,* for Appellant, submitted a brief and one in reply to that of Respondent; *Mr. O. K. Grimstad* argued the cause orally.

It is our opinion that the $1,000 registered Liberty bond was non-negotiable. We mean by this that it was not the character of a bond that would be negotiated so as to come within the purview of the Negotiable Instruments Act. A photostatic copy of it shows that the bond was payable to Ben Grosfield, and that it was not indorsed by Ben Grosfield, assuming that the signature is his, but does show that it was assigned by him, and we submit that there is a vast difference between indorsing an instrument and assigning it. (See *Helena Nat. Bank* v. *Rocky Mountain Tel. Co.,* 20 Mont. 379, 63 Am. St. Rep. 628, 51 Pac. 829; *Sathre* v. *Rolfe,* 31 Mont. 85, 77 Pac. 431; *Cornish* v. *Woolverton,* 32 Mont. 456, 108 Am. St. Rep. 598, 81 Pac. 4; *Williams* v. *Johnson,* 50 Mont. 7, Ann. Cas. 1916D, 595, 144 Pac. 768; *First Nat. Bank* v. *Grow,* 57 Mont. 376, 188 Pac. 907; *Gale* v. *Mayhew,* 161 Mich. 96, 29 L. R. A. (n. s.) 648, 125 N. W. 781.)

We submit, therefore, that the defendant could not be a holder in due course of the bond. At most it was merely an assignee, and as such, of course, took it subject to all the rights of the plaintiff. The defendant could not obtain a better title than its assignor had, and of course the record in this case discloses that its assignor had no title whatever to the bonds in question.

Under the facts of this case it was a matter for the jury to determine whether or not the defendant came into possession of the bonds without any notice of any defect in the title to them. We submit that it was incumbent upon the defendant in this case to prove not only that its cashier, who handled the transaction, was without knowledge of any facts which might put it upon inquiry, but that it must go further and prove that its other officers, who were active in the affairs of

the bank, were likewise without knowledge of any defect in the title to the bonds in question. (*First Nat. Bank* v. *Wilson*, 57 Mont. 384, 188 Pac. 371; *Bennett State Bank* v. *Schloesser*, 101 Iowa, 571, 70 N. W. 705; *Darrow* v. *Blake*, 58 Iowa, 750, 13 N. W. 50; *Commercial Bank of Essex* v. *Paddick*, 90 Iowa, 63, 57 N. W. 687; *Arnd* v. *Aylseworth*, 145 Iowa, 185, 29 L. R. A. (n. s.) 638, 123 N. W. 1000; *Stephenson* v. *Perry* (Neb.), 199 N. W. 499; *State Bank* v. *Cook*, 125 Iowa, 111, 100 N. W. 72.)

· *Mr. George W. Farr*, for Respondent, submitted a brief and argued the cause orally.

The $1,000 bond having been indorsed in blank it was negotiable by delivery. The other bonds were not registered bonds and were also negotiable by delivery. Section 8437, Revised Codes of 1921, provides that an instrument is negotiable when it is transferred from one person to another in such a manner as to constitute the transferee the holder thereof. If payable to bearer, it is negotiable by delivery; if payable to order it is negotiable by the indorsement of the holder, completed by delivery. Plaintiff having executed. the form for the transfer of the legal title to the $1,000 Liberty bond in blank by whatever name his act be called, indorsement or assignment, he is bound by his act.

It is the general rule that, if the owner of negotiable paper of any kind, payable to bearer or indorser in blank, delivers it to another in that condition, he is thereby estopped to claim it as against a *bona fide* purchaser or pledgee for value of the latter. (See note, 29 L. R. A. (n. s.) 252.) The supreme court of Illinois in the case of *McCarthy* v. *Crawford*, 238 Ill. 38, 128 Am. St. Rep. 95, 29 L. R. A. (n. s.) 252, 86 N. E. 750, holds: "That the holder of a certificate of indebtedness of a corporation having a blank for assignment on its back, who indorses it in blank and delivers it to his brokers for sale, is bound by their act in transferring it to a *bona fide* purchaser

for value." The indorsement in blank is entirely proper and did not charge the defendant bank with notice of defect in title. (*Commerce Trust Co.* v. *Guarantee T. & T. Co.,* 113 Kan. 311, 214 Pac. 610.)

In *Stevens* v. *Hines,* 63 Mont. 94, 206 Pac. 443, this court held that judicial notice would be taken of the time the United States government took over and assumed jurisdiction of the railroads. With like parity of reasoning we submit that the courts will take judicial notice of the acts and transactions of the Treasury Department of the United States government in the issuance of Liberty Loan bonds; of their form, denominations, character, method of execution and form of transfer, *etc.* A government bond is truly a "courier without luggage, whose face is its own passport." (*Baker State Bank* v. *Grant,* 54 Mont. 7, 166 Pac. 27.)

As to the right of the owner of stolen government bonds to recover from purchaser in due course; The Liberty bonds alleged to have been converted by the defendant bank being negotiable instruments and the defendant bank having received possession and title of said bonds in due course, as the term "due course" is defined by section 8459, Revised Codes, we submit that although the First National Bank of Ingomar may have wrongfully come into possession of said bonds, the First National Bank of Miles City in acquiring the bonds from the Ingomar bank acquired a good title thereto as against the true owner. (Joyce's Defenses to Commercial Paper, sec. 394.) The rule as to the rights of innocent purchasers of stolen bonds is well stated in the note in 1 A. L. R., at page 717, and a large number of cases are cited in support of the text. See, also Ann. Cas. 1916A, 603; 9 Corpus Juris., 63; *Pratt* v. *Higgenson,* 230 Mass. 256, 1 A. L. R. 714, 119 N. E. 661, a case very similar to this one.) ·

The bank having taken the bonds as collateral to an indebtedness, it is protected to the same extent and as fully as though it had actually paid cash therefor. (*Yellowstone Nat. Bank* v.

*Gagnon,* 19 Mont. 402, 61 Am. St. Rep. 520, 48 Pac. 762; *Grace Methodist Episcopal Church* v. *Richards,* 16 Mont. 70, 40 Pac. 73.) The term "good faith" as that term is used by the courts means the absence of bad faith, and it is a rule that actual bad faith must be shown. It is not sufficient to show gross negligence on the part of the purchaser or facts and circumstances which might or ought to have raised suspicion in his mind. Guilty conscience or willful ignorance on the part of the purchaser must appear. (Note, 1 Am. St. Rep. 719, and cases cited; Brannon's Negotiable Instruments, 188; note, 29 L. R. A. (n. s.) 385.)

MR. JUSTICE STARK delivered the opinion of the court.

This action was originally commenced against the defendant First National Bank of Miles City, the First National Bank of Ingomar, and E. E. Fleming, as receiver of the First National Bank of Ingomar, but during the course of the trial was dismissed as to the last two named parties, leaving the First National Bank of Miles City alone as the defendant.

In his complaint, the defendant alleges that he was at all the times mentioned the owner of, and entitled to the immediate possession of, the following described Liberty bonds, to-wit: One Liberty bond, Fourth issue, No. 150034, of the denomination of $1,000; one Liberty bond, Third issue, No. 6214635, of the denomination of $100; one Liberty bond, Third issue, No. 6214634, of the denomination of $100; one Liberty bond, Third issue, No. 6214633, of the denomination of $100; one Liberty bond, Victory issue, No. 169622, of the denomination of $500— all of the value of $1,800; that said bonds were by him deposited in his safety deposit box in the First National Bank of Ingomar for safekeeping and no other purpose, and that at some time subsequent to December 23, 1920, the said First National Bank of Ingomar, without his consent, against his express directions, without any authority whatever therefor, but with the intent to steal the same, took said bonds from his safety

deposit box and delivered them to the defendant First National Bank of Miles City, and on information alleges that the Miles City bank had sold the bonds and converted the proceeds thereof to its own use. He further alleges that the Miles City bank, at the time the bonds were delivered to it, had knowledge that the same belonged to him, and that the Ingomar bank had no right, interest, or title in or to the same, or should have known these facts in the exercise of ordinary business prudence. He further alleges that all of said bonds were registered in his name, that he had never indorsed any of them, or authorized any one to do so for him, and that, prior to the commencement of this action, he had made demand on the defendant for the return of the bonds, but that return thereof had been refused. The prayer of the complaint is for judgment for the sum of $1,800, with interest from December 23, 1920.

To this complaint the defendant First National Bank of Miles City filed an answer, in which it alleged that on and prior to the twenty-third day of December, 1920, the Ingomar bank was indebted to it in large sums of money; that it had refused to carry said indebtedness longer unless the Ingomar bank would give it additional security to what it then held, and that, in consideration of its carrying the indebtedness of the Ingomar bank for a longer period of time, and of the renewal of such indebtedness, the Ingomar bank, on December 23, 1920, delivered to it the Liberty bonds mentioned in the complaint as additional security; that it received and accepted said bonds as collateral for the payment of said indebtedness, and that thereafter, with the knowledge and consent of the Ingomar bank, it credited the full cash market value of said Liberty bonds, to-wit, $1,930.44, upon the indebtedness then due and owing to it from the Ingomar bank; that at the time of the delivery of the bonds to it, the defendant had no knowledge of plaintiff's claim to said bonds; that they were negotiable in form, and that the plaintiff had theretofore executed an assignment in due form of the $1,000 bond; that there was nothing in the

transaction or in the bonds to indicate or show that the Ingomar bank was not the owner and holder of the bonds; that they were received and accepted by the defendant without any notice or knowledge of any claim of the plaintiff thereto, and that it was the owner and holder for value in due course of business of all of said bonds.    The affirmative allegations of the answer were put in issue by a reply.

The case came on for trial before a jury on April 2, 1924, and, at the close of all of the evidence, the court sustained the defendant's motion for a directed verdict and entered judgment against the plaintiff, from which he has appealed.

The plaintiff testified that during the war he purchased the bonds in question through the First National Bank of Ingomar, with which he was then doing his banking business and in which he maintained a safety deposit box; that the bonds were placed in this safety deposit box, the key to which was left in the charge and keeping of the officers of the bank; that he never sold, assigned, or transferred any of the bonds or authorized any person to do so in his behalf.    He further stated that the bonds remained in the box and were last seen by him about the month of November, 1921, just before he left on a trip to Norway.    He returned from this trip about June, 1922, and immediately went to the bank to look for his bonds, but they were not in his box or in the bank, and he was later advised that they were in the First National Bank of Miles City.    He was shown a photostatic copy of the back of the $1,000 bond which contained the following inscription:

"Transfer.

"For value received —— assign to Fred A. Volkmar the within registered bond of the United States and hereby authorize the transfer thereof on the books of the United States Treasury Department.

"BEN GROSFIELD.

"Personally appeared before me, the above-named assignor, known or proved to me to be the payee of the within bond, and

signed the above transfer, acknowledging the same to be his free act and deed. Witness my hand, official designation, and seal.

"THE FIRST NATIONAL BANK OF INGOMAR.

[Signature of Attesting Officer.]

"[Seal.]                         By C. H. WRYE, Cashier.

[Official Designation.]

"Dated at Ingomar, Mont., Dec. 23, 1920."

Asked whether the name "Ben Grosfield" was a copy of his signature, he replied: "I couldn't say if that is my signature or not; I wouldn't say it isn't, and I wouldn't say it is."

For the purpose of comparison, three acknowledged genuine signatures of the plaintiff were admitted in evidence as a part of his cross-examination. On redirect examination he testified that he never appeared before Mr. Wrye and signed his name on the $1,000, and that he had never heard of Fred A. Volkmar, who appears as the assignee thereof.

The testimony on the part of the defendant tended to show that on December 23, 1920, the Ingomar bank was indebted to the Miles City bank in the sum of $7,700, which was secured by three rediscounted notes, and at that time wished to increase this indebtedness to $10,000, to accomplish which it issued its certificate of deposit for $10,000 in favor of the Miles City bank, dated December 27, 1920, due six months after date. The Miles City bank demanded additional security before increasing the loan. This security was furnished by the Ingomar bank depositing additional notes, and the bonds in question, with the Miles City bank, as collateral, and the loan then completed.

Wedge, cashier of the Miles City bank, testified that the bonds, other than the $1,000 Fourth Liberty Loan bond, were coupon bonds payable to bearer, but that the $1,000 bond was a registered bond, originally payable to Ben Grosfield, plaintiff, but that, when received by the Miles City bank, it had thereon the transfer above set out, bearing what purported to

be the signature of Ben Grosfield, except that the name of Fred A. Volkmar had not been inserted. The certificate of deposit issued by the Ingomar bank under date of December 27, 1920, was not paid at maturity, but was renewed from time to time down to April 5, 1922, when it was again renewed for a period of three months. This last certificate of deposit not having been paid at maturity, the Miles City bank proceeded to realize on its securities, and on September 1, 1922, sold the bonds in question for $1,930.44, which amount was credited on the indebtedness represented by the certificate of deposit. This witness further stated that the transaction relative to the receipt of these bonds as additional security was carried on by him alone, without consultation with any of the other officers of his bank, that there was nothing in connection with the bonds or the transaction to indicate to him or to cause any suspicion that they did not belong to the Ingomar bank, and that they were received and accepted in the ordinary course of commercial banking transactions. This witness and two others, by a comparison of the admittedly genuine signatures of the plaintiff with his purported signature on the photostatic copy of the back of the $1,000 bond, gave it as their opinion that the signature on the bond was the genuine signature of the plaintiff.

None of the bonds in question were produced at the trial; the only physical evidence of the form of any of them being the photostatic copy of the back of the $1,000 bond above referred to.

Other than as above indicated, there was no testimony to contradict the plaintiff's purchase and ownership of the bonds in question. The testimony as a whole warrants no conclusion other than that some officer of the Ingomar bank deliberately broke into the plaintiff's safety deposit box, took his $1,800 of bonds therefrom, and converted them to the use of the bank.

The plaintiff has assigned three specifications of error. In [1] reference to the first specification, witness Wedge, cashier

of the defendant bank, had testified that at the time the $1,000 registered bond was delivered to the bank as collateral, the name of the assignee "Fred A. Volkmar" was not written in. To explain the presence of this name in the instrument, the witness was permitted to testify, over plaintiff's objection, that it was the custom of banks, in receiving such instruments as collateral, not to insert the name of the assignee—to have it transferred in blank—so that when the collateral should be returned to the debtor furnishing the collateral it would not be necessary to make another assignment. The objection was that it was admitted to prove a custom when there was no pleading to justify it.

If it be assumed that the plaintiff executed an assignment of the bond in blank, and delivered it to the Ingomar bank, which in turn deposited it with the Miles City bank as collateral, there can be no doubt but that either of these banks would have authority to fill in the name of the assignee or transferee, and would be entitled to make proof thereof without specially pleading a custom. This specification is without merit.

The second specification of error is that the court erred in [2] admitting in evidence the defendant's Exhibits "R" and "S," being certificates of deposit for $10,000 each, issued by the Ingomar bank in favor of the Miles City bank, dated, respectively, July 22, 1921, and January 5, 1922. In order to pass upon this assignment it is necessary to go into the history of the entire transaction concerning the indebtedness of the Ingomar bank to the Miles City bank covering the period involved.

At the time the bonds in question were deposited with the Miles City bank as collateral, the Ingomar bank issued its certificate of deposit dated December 27, 1920, which was due on June 27, 1921, and was shown by defendant's Exhibit "Q." This certificate was not taken up at maturity, but was renewed on July 22, 1921, by a certificate of deposit due on

October 22, 1921, which was evidenced by defendant's Exhibit "R." On November 4, 1921, this indebtedness was again renewed by a certificate of deposit bearing that date, but which was not produced in evidence. The certificate, however, was again renewed on January 5, 1922, by a certiificate of deposit which matured on April 5, 1922, and was shown by defendant's Exhibit "S." This latter certificate was again renewed on April 5, 1922, for the sum of $9,057.62, which matured on July 5, 1922, and was shown by defendant's Exhibit "N." The bonds were sold on September 1, 1922, for the sum of $1,930.44, and that amount was credited on defendant's Exhibit "N."

From the foregoing it appears that Exhibits "R" and "S," to which objection was made, are merely two in a series of renewals of the original certificate of deposit dated December 27, 1920. Each renewal of the certificate represented the same indebtedness, only in another form. There was no evidence showing that the amount of indebtedness of the Ingomar bank to the Miles City bank had increased between December 27, 1920, and April 5, 1922, when Exhibit "N" was executed. Upon this state of the record there was no error committed in admitting Exhibits "R" and "S."

The third specification of error is that the court erred in [3] directing the jury to return a verdict in favor of the defendant.

A primary question which we are required to consider is whether the court can take judicial notice of the form and contents of the Liberty bonds described in the complaint. Section 10532, Revised Codes of 1921, provides: "Courts take judicial notice of the following facts: * * * 3. Public and private official acts of the legislative, executive, and judicial departments of this state and of the United States. * * * 8. The * * * political history of the world."

The Third, Fourth and Victory Loan bonds, issued by the government of the United States during the World War, were

authorized by the Act of Congress approved September 24, 1917 (40 Stats. at Large, 288), as amended by Acts approved, respectively, on April 4, 1918 (*Id.,* 502), July 9, 1918 (*Id.,* 844), and March 3, 1919 (*Id.,* 1309), being U. S. Comp. Stats. Ann. Supp. 1919, sec. 6829ii *et seq.* Each of these Acts in effect provides that the Secretary of the Treasury, with the approval of the President, is authorized to borrow from time to time, on the credit of the United States, the amounts therein authorized, and to issue therefor bonds of the United States, which bonds shall be in such form and denominations and subject to such terms and conditions of issue, rates of interest, and times of payment of interest as the Secretary of the Treasury from time to time at or before the issue thereof may prescribe.

Referring to the annual report of the Secretary of the Treasury for 1918, page 165, we find that, by a department circular dated April 6, 1918, he invited subscriptions for the Third Liberty Loan bonds in which the same are particularly described, by giving the denominations of bearer bonds with interest coupons attached, and bonds registered as to principal and interest, and likewise prescribing the rate of interest, when the same shall be paid, and giving the date of maturity thereof. On page 179 of the same volume the Secretary of the Treasury gives like information relative to the Fourth Liberty Loan bonds, and, on page 242 of the annual report of the Secretary for 1919, similar information is given as to the Victory Loan bonds.

It is a part of the political history of the United States that the invitations by the Secretary of the Treasury for subscriptions to these various bond issues were accepted by widespread response, with the result that probably a majority of our people above the age of twenty-one years became the owners of one or more bonds issued under some of these authorizations and invitations.

Since the bonds were authorized and issued under Acts of Congress, their form and contents prescribed by the public

proclamations of one of the chief officers of the executive departments of our government, and, as we know as part of our political history that they were in fact so generously purchased by our citizens, we cannot conclude other than that it is the duty of the court to take judicial notice of these bonds and whatever provisions they contain. This conclusion is sustained, in principle, by the following authorities: *Caha* v. *United States,* 152 U. S. 211, 221, 38 L. Ed. 415, 14 Sup. Ct. Rep. 513 [see, also, Rose's U. S. Notes]; *United States* v. *American Gold Coin,* 24 Fed. Cas. No. 14,439; *United States* v. *Williams,* 6 Mont. 379, 12 Pac. 851; *Johnson* v. *County of Lincoln,* 50 Mont. 253, 146 Pac. 471.

By reference to bonds of the various issues involved, we are [4] able to ascertain that a coupon bond is in effect merely a promissory note of the United States, payable to bearer, the interest upon which is represented by negotiable coupons attached thereto, and the title to which passes by delivery, and hence is subject to the provisions of the Negotiable Instruments Act (Rev. Codes 1921, sec. 8401 *et seq.*).

In a registered bond, the provision is that "the United States of America, for value received, promises to pay to —— or registered assigns, the sum of —— and to pay interest," *etc.,* and on the reverse side bears the form of transfer above set out, to which is appended a note advising the holder that, in order to effect a transfer of the bond, the registered owner or someone duly authorized to act for him must go before one of the officers authorized by the Secretary of the Treasury to witness assignments and in the presence of this officer sign the form of transfer.

Section 8408, Revised Codes of 1921, provides that "An instrument to be negotiable must conform to the following requirements: * * * 4. Must be payable to order or to bearer."

The form of these registered bonds, with the provisions which they contain for their transfer, clearly indicates that it was

not the intention of the government in issuing them to make them subject to the Negotiable Instruments Act. While we have not been able to find any cases treating specifically of the negotiability of this form of government bonds, the following cases sustain the assertion that instruments in the form of these registered government bonds are not negotiable instruments: *Wettlaufer* v. *Baxter,* 137 Ky. 362, 26 L. R. A. (n. s.) 804, 125 S. W. 741; *Quast* v. *Ruggles,* 72 Wash. 609, 131 Pac. 202; *Zander* v. *New York Security & Trust Co.,* 178 N. Y. 208, 102 Am. St. Rep. 492, 70 N. E. 449; *Rottman* v. *Hevener,* 54 Cal. App. 485, 202 Pac. 334; *Cochran* v. *Bowersox,* 188 Ill. App. 157; *Borough Montvale* v. *People's Bank,* 74 N. J. L. 464, 67 Atl. 67.

From the foregoing it appears that it will be necessary to consider the rules governing the two classes of bonds separately.

It was shown without contradiction that all of these bonds [5] were purchased by the plaintiff; that they were taken from him without any right, by some person connected with the Ingomar bank which, although it had no title to them, subsequently deposited them as collateral with the Miles City bank, which became the holder thereof.

As to the character of the four bonds aggregating $800, the plaintiff testified that the officers of the Ingomar bank, through whom they were purchased, stated to him that they were registered bonds, and also testified that the interest on them came to him from Washington, D. C.; while Wedge, cashier of the defendant bank, said that they were merely coupon bonds. If the interest on these bonds in fact came to the plaintiff direct from Washington, it would indicate that they were registered bonds, since that is the government's method of paying the interest on registered bonds.

By this testimony a question of fact was presented which should have been submitted to the jury for determination. [6] Assuming, however, that the $800 of bonds were coupon bonds which would make them subject to the Negotiable Instru-

ments Act, it was incumbent upon the defendant to show, in order to defeat the plaintiff's claim of ownership, that it was a holder in due course under the provisions of section 8466, Revised Codes of 1921, which provides: "Every holder is deemed *prima facie* to be a holder in due course; but when it is shown that the title of any person who has negotiated the instrument was defective, the burden is on the holder to prove that he or some person under whom he claims, acquired the title as holder in due course."

Section 8459 defines what constitutes a holder in due course as follows: "A holder in due course is a holder who has taken the instrument under the following conditions: 1. That it is complete and regular upon its face; 2. That he became the holder of it before it was overdue, and without notice that it has been previously dishonored, if such was the fact; 3. That he took it in good faith and for value; 4. That at the time it was negotiated to him he had no notice of any infirmity in the instrument or defect in the title of the person negotiating it."

Section 8465 provides: "In the hands of any holder other than a holder in due course, a negotiable instrument is subject to the same defense as if it were non-negotiable."

The witness Wedge testified that he carried on the transaction with reference to taking these bonds as collateral security, and that he had no knowledge or notice of any facts to even arouse a suspicion that they did not belong to the Ingomar bank; that he did not consult with any other officer or employee of the defendant bank concerning the matter; that the bonds were taken in the ordinary course of commercial banking business; and that he made no inquiry from any of the officers of the Ingomar bank concerning their ownership. No other officer or agent of the defendant bank gave testimony at the trial.

The record shows that when the Ingomar bank made application for the additional loan it was considered by the defendant's board of directors and was granted on condition that

sufficient collateral security should be furnished. Wedge testified that, while these negotiations were pending, the Ingomar bank sent down some collateral that he did not deem sufficient and so advised the Ingomar bank, which thereupon sent down the bonds in question as additional security.

It appears that there were some fifteen or sixteen people employed in the defendant bank, but how many of them were engaged in active managerial capacities was not disclosed.

There was proof introduced which showed that H. B. Wiley was president and a director of the Ingomar bank in December, 1920, but it was not shown that he actively participated in the management of its business. There was also some testimony introduced from which the jury might have been warranted in finding that H. B. Wiley was at the same time a vice-president of the defendant bank, but the testimony showed clearly and without contradiction that Mr. Wiley was not then taking any active part in the affairs of the latter bank, was not doing work of any kind there, was only in the bank a part of the time, and that he was given a desk merely as a matter of courtesy to one who had been theretofore connected with the institution for a long time.

Upon this condition of the record, counsel for plaintiff argue that the question whether the defendant bank received the bonds in good faith and without notice of a defect in the title of the Ingomar bank should have been submitted to the jury, on the theory that Mr. Wiley, as president and director of the Ingomar bank, must be held chargeable with knowledge of the fact that it had no title to or interest in the bonds, and that the Miles City bank, of which he was a vice-president, was chargeable with knowledge imputable to Wiley as president of the Ingomar bank, and for the further reason that it was not shown that other officers participating in the management of the defendant bank did not have knowledge or notice of the defect in the title of the Ingomar bank when the bonds were accepted as collateral.

Since the record shows that Wiley was president of the [7-9] Ingomar bank and a member of its board of directors, he was, as such, chargeable with at least constructive notice of the infirmity in that bank's title to the bonds. (*McCarty* v. *Kepreta,* 24 N. D. 395, Ann. Cas. 1915A, 834, 48 L. R. A. (n. s.) 65, 139 N. W. 992.) The testimony, however, shows that he had no part in the business affairs of the defendant bank. Whatever knowledge he may have had, or whatever knowledge may have been properly imputed to him as an officer of the Ingomar bank, was wholly outside of any possible connection he may have had with the defendant.

In a note appended to the case of *Arlington Brewing Co.* v. *Bluethenthal & Bickart,* 36 App. D. C. 209, Ann. Cas. 1912C, L. R. A. 1918C, 901, the writer says: "It is a well-settled rule that knowledge acquired by an officer of a corporation, while acting, not in the behalf of the corporation, but for himself or in a manner antagonistic to the corporation, is not imputable to the corporation."

Under the circumstances of this case, the Miles City bank was not chargeable with notice of the knowledge imputable to Wiley as president of the Ingomar bank. However, a corporation can act only through its officers and agents. If some officer or agent of the defendant, acting within the scope of his authority as such, had knowledge or notice of the status of the title of the Ingomar bank to the bonds when the defendant accepted them as collateral, such knowledge or notice would be attributed to the defendant. (7 R. C. L. 653.) Of those engaged in the management of the defendant bank, Wedge alone testified to a lack of such notice or knowledge. The bur- [10] den was not on the plaintiff to show that the defendant did have such notice or knowledge, but was upon the defendant to show that it did not. On the record the court could not say as a matter of law that the defendant had sustained this burden and the question should have been submitted to the jury for determination.

As to the $1,000 registered bond (and the other $800 bonds,
[11] if they were registered) the situation is wholly different.
As above pointed out, a registered Liberty Loan bond is not a
negotiable instrument. It is well known to be the general rule
that a thief acquires no title to stolen property, and that
he can pass none. (*Collins* v. *Ralli*, 20 Hun (N. Y.), 246;
*Breckenridge* v. *McAfee*, 54 Ind. 141; *Barstow* v. *Savage Min.
Co.*, 64 Cal. 388, 49 Am. Rep. 705, 1 Pac. 349.) Speaking of
the title to a non-negotiable instrument which had been stolen
from the owner, and by the thief sold to an innocent purchaser,
in good faith and for value, the supreme court of Massachusetts
in *Scollans* v. *Rollins*, 173 Mass. 275, 73 Am. St. Rep. 284, 53
N. E. 863, said: "The property of the true owner of docu-
ments of the nature of those now in question is not divested by
a sale to a purchaser, in good faith and for value, from one who
has got them feloniously from the true owner nor by any subse-
quent dealing of such a purchaser with the documents, but the
property remains with the true owner from whom they were
feloniously taken. The real ownership in such documents fol-
lows the general rule as to the ownership of chattels, the only
exception to which is as to property which consists of the cur-
rency of the country or securities which by the law merchant
are negotiable." So in this case, as to such of the bonds as
were non-negotiable, the defendant acquired no better title
than the Ingomar bank had, and, if the latter bank stole them
from the plaintiff, his title thereto was not divested.

The only proof introduced, tending to establish the fact that
[12] the plaintiff signed his name to the purported transfer
of the $1,000 bond, was that of three witnesses who qualified
themselves as experts to express an opinion thereon, under
the provisions of section 10592, Revised Codes of 1921. In
sustaining the motion for a directed verdict the court in effect
told the jury that they must accept the testimony of these wit-
nesses as true. Such is not the law.

[73 Mont. 219.]

The testimony of an expert as to handwriting is simply an expression under oath, of an opinion which he entertains, and the jury is not bound by it any further than it coincides with the opinion which it may form from all the circumstances and by an examination of the handwriting in question. (*United States* v. *Molloy* (C. C.), 31 Fed. 19). Where proof of handwriting is sought to be made by comparison, the weight to be given to such testimony must be left to the jury. (*United States* v. *Pendergrast* (C. C.), 32 Fed. 198, 201; *Bradford* v. *People,* 22 Colo. 157, 160, 43 Pac. 1013; *Forgey* v. *First Nat. Bank,* 66 Ind. 123; *Christman* v. *Pearson,* 100 Iowa, 634, 69 N. W. 1055; *Ort* v. *Fowler,* 31 Kan. 478, 486, 47 Am. Rep. 501, 2 Pac. 580; *Commonwealth* v. *Williams,* 105 Mass. 62; *Koons* v. *State,* 36 Ohio St. 195.)

Upon the record presented, the court erred in directing a verdict in favor of the defendant. As pointed out, there were several questions which the plaintiff was entitled to have submitted to the jury for determination.

For the reasons indicated, the judgment is reversed and the cause remanded to the district court for further proceedings.

*Reversed and remanded.*

MR. CHIEF JUSTICE CALLAWAY and ASSOCIATE JUSTICES HOLLOWAY, GALEN and MATTHEWS concur.

Rehearing denied May 5, 1925.