REID, Receiver, Respondent, *v.* LINDER et al., Appellants.

(No. 5,956.)

(Submitted September 20, 1926. Decided November 18, 1926.)

[251 Pac. 157.]

*Partnership — Promissory Notes — Liability of Partners — Non-trading Partnerships—Banks and Banking—Receivers—Evidence—Custom and Usages.*

Banks and Banking—Minutes of Board of Directors Best Evidence of Who in Charge of Bank—Offer of Proof to Show Contrary—Proper Rejection.
1. Where, in an action by a receiver to recover on promissory notes, the minutes of the board of directors of the bank were in evidence showing who was in active charge of its affairs prior to its closing, such minutes were the best evidence and the court did not commit reversible error in refusing an offer of proof on the subject.

Trial — Evidence — Exclusion Harmless Where Facts Subsequently Brought Out in Other Testimony.
2. Exclusion of testimony on a point subsequently fully canvassed in the examination of the witness and others was harmless.

---

2.  See 2 R. C. L. 254.

[77 Mont. 406.]

Partnership — Agreement Between Partners That Partnership Notes Should Bear Signatures of All—Evidence—Insufficiency.

3.   Where partners sought to escape liability on firm notes on the ground that there was an agreement between the partners, known to a bank, that the names of all of them should appear on a partnership note before the bank could honor it, testimony showing a mere casual conversation between the partners, of whom the managing agent of the bank was one, was insufficient to establish such agreement.

Same—Promissory Notes—Custom Requiring Signatures of All Partners —Evidence—Insufficiency.

4.   Evidence *held* insufficient to establish a custom of a partnership, known to the bank to which its notes ran, requiring all firm notes to be signed by all the partners, where the record disclosed notes, acknowledged as firm notes or renewed as such, signed by only one member of the firm and indorsed on the back by the individuals constituting the firm.

Same—Nontrading Partnership—What Constitutes—Implied Power to Borrow Money on Promissory Notes not Existent—When Rule Inapplicable.

5.   The test of a nontrading partnership is buying and selling; if it buys and sells or engages in trading requiring capital and the use of credit, the rule that a nontrading partnership has no implied power to borrow money and give firm mercantile paper therefor has no application to it, and where the facts in this respect are undisputed, the question whether it is one or the other is one of law.

Same—Promissory Notes—When Claim of Want of Consideration not Maintainable.

6.   Where notes of a partnership executed by one member thereof were renewal notes the proceeds of which were credited by the payee bank to the checking account of the firm, the contention of defendants (members of the partnership) that they received no consideration either as individuals or as members thereof, for the notes, has no merit.

Same—Promissory Notes Executed by One Member of Firm Binding on All Members of Trading Partnership.

7.   Notes executed by one member of a trading partnership for the benefit of the firm were partnership obligations binding upon all its members, in the absence of a showing of bad faith on the part of the contracting partner, and, if bad faith existed, of knowledge thereof on the part of the payee.

Same—Misappropriation of Funds Obtained by One Member of Firm on Note of Partnership No Defense to Note.

8.   The fact that a partner used funds obtained on a partnership note in speculating on the grain market did not deprive the payee bank of its right to recover thereon, where the borrowing was ostensibly authorized and the bank was a *bona fide* lender.

Corporations—When Knowledge of Officer not Imputable to Corporation.

9.   Knowledge acquired by an officer or agent of a corporation— a bank—is not imputable to it when it is acquired concerning

---

7.   See 20 R. C. L. 900.
9.   See 7 R. C. L. 657.

transactions in which the officer's interests are adverse to those of the corporation.

Banks and Banking—Knowledge of Managing Cashier's Transactions not Imputable to Bank, When.

10. The rule announced in some jurisdictions that where but a single officer of a corporation transacts its business without the co-operation of any of its other officers, his knowledge of his transactions is imputable to the corporation on the theory that there is no one from whom he can conceal it, does not apply in the case of a managing bank cashier whose loans to a partnership of which he was a member were required to be passed upon by its board of directors; under such circumstances the knowledge acquired by him as member of the firm and not as bank official, is not imputable to the bank.

Same—Receiver's Action on Note—Receiver Acts as Assignee of Insolvent.

11. The receiver of an insolvent bank in bringing action on promissory notes running to the bank does so, not as purchaser thereof, but as assignee of the insolvent, enjoying the same rights as the bank; hence the contention that he paid nothing for them and took them after maturity does not affect his right to recover thereon.

Partnership—Promissory Notes Executed by One Partner—Liability of All Until Notice of Dissolution.

12. In the absence of the notice required by section 8012, Revised Codes of 1921, of the dissolution of a partnership, the liability of the members of the firm for a note executed to a bank by one of them continued even though at the time of its execution dissolution had been effected, and the maker of it was an officer of the payee bank. (See par. 10, above.)

[1]   Appeal and Error, 4 C. J., sec. 2993, p. 1009, n. 3.
[2]   Appeal and Error, 4 C. J., sec. 2994, p. 1010, n. 7.
[3]   Partnership, 30 Cyc., p. 590, n. 14.
[4]   Customs and Usages, 17 C. J., sec. 91, p. 523, n. 63.
[5]   Partnership, 30 Cyc., p. 478, n. 53; p. 504, n. 77; p. 598, n. 26.
[6]   Partnership, 30 Cyc., p. 506, n. 78.
[7]   Partnership, 30 Cyc., p. 503, n. 73.
[8]   Partnership, 30 Cyc., p. 504, n. 74.
[9]   Banks and Banking, 7 C. J., sec. 136, p. 534, n. 93.
[10]  Corporations, 14a C. J., sec. 2360, p. 492, n. 71.
[11]  Banks and Banking, 7 C. J., sec. 502, p. 735, n. 67.
[12]  Partnership, 30 Cyc., p. 675, n. 51.

*Appeal from District Court, Madison County in the Fifth Judicial District; S. D. McKinnon, a Judge of the Fifteenth District, presiding.*

ACTION by Edgar P. Reid, as receiver of the Bank of Twin Bridges, a corporation, against A. A. Linder and others, copartners doing business under the firm name and style of the Trout Creek Land Company, and A. J. Wilcomb. From a

judgment for plaintiff, defendants, other than Wilcomb, appeal. Affirmed.

*Mr. M. M. Duncan* and *Mr. C. A. Spaulding,* for Appellants, submitted a brief and argued the cause orally.

The rule of law governing the facts in this case is succinctly stated as follows: "Where a corporate agent, represents with the corporation's consent, both the corporation and a partnership of which such agent is a member, in a transaction between them, knowledge possessed by him as a partner and affecting the transaction, will be imputed to the corporation." (14a Corpus Juris, 442, par. 2360; *Gila Land & W. Co.* v. *Page,* 20 Ariz. 400, 181 Pac. 457; *Taylor* v. *Felder,* 3 Ga. 287, 59 S. E. 844; *Seixas* v. *Citizens Bank,* 38 La. Ann. 424.) These appellants insist that the present case comes squarely within the above rule. The facts in the case cannot bring it within any other rule or within any exception to this rule. Here is a case where the bank knew that Wilcomb, one of its directors, its president and active agent, was a member of a partnership, and with this knowledge consented by its acts and otherwise that Wilcomb should act as its agent in dealing with this partnership of which it actually knew Wilcomb was a member. It not only permitted him as its agent to loan the money evidenced by these notes to this partnership in name, but approved and ratified the loans when the notes representing the loans showed conclusively upon their face that they were made by Wilcomb alone, in the name of the partnership. Under the above rule, if there was any infirmity in these notes, failure of consideration to the firm, or any of these appellants, or fraud in their execution, or delivery, knowledge thereof possessed by Wilcomb is imputed to the bank.

It is true that "it is a well-settled rule that the knowledge acquired by an officer of a corporation, while acting not in behalf of the corporation, but for himself, or in a manner antagonistic to the corporation, is not imputable to the corporation." (*Brookhouse* v. *Union Pub. Co.,* 73 N. H. 368, 111 Am. St. Rep. 623, 2 L. R. A. (n. s.) 993, 62 Atl. 219; *Arlington Brew-*

*ing Co.* v. *Bluethenthal & Bickart,* 36 App. D. C. 209, Ann.
Cas. 1912C, 294, L. R. A. 1918C, 901.) But such has never
been the rule where such knowledge was acquired by an officer
of a corporation while acting in behalf of the corporation as
well as for himself, with the corporation's knowledge, approval
or consent, whether acting in a manner antagonistic to the
corporation or not. In such a case the rule is uniform that
the knowledge acquired by such officer while so acting is im-
putable to the corporation. (*Grosfield* v. *First Nat. Bank,*
73 Mont. 219, 236 Pac. 250; *Peninsular Trust Co.* v. *Johnson,*
128 Md. 535, 97 Atl. 925; *Bank of Pittsburg* v. *Whitehead,*
*Sproul & Co.,* 10 Watts (Pa.), 397, 36 Am. Dec. 186; *Le Duc*
v. *Moore,* 111 N. C. 516, 15 S. E. 888; *Ladd* v. *Read,* 114 Kan.
175, 217 Pac. 273; *Gates* v. *Gregory,* 91 Wash. 151, 157 Pac.
470; *Saratoga Investment Co.* v. *Kern,* 76 Or. 243, 148 Pac.
1125; *Palo Alto Mutual Bldg. & Loan Assn.* v. *First Nat.
Bank,* 33 Cal. App. 214, 164 Pac. 1124; *Commercial Bank &
Trust Co.* v. *Hauf,* 32 Wyo. 127, 230 Pac. 539.) "Notice to a
cashier of a bank is notice to the bank in transactions conducted
by him for it within the scope of his authority, regardless of
his *bona fides* in conducting such transactions when the bank
adopts his acts." (*Farmers' Bank* v. *Saling,* 33 Or. 394, 54
Pac. 190.)

*Messrs. Maury & Brown,* for Respondent, submitted a brief;
*Mr. H. L. Maury* argued the cause orally.

MR. JUSTICE MATTHEWS delivered the opinion of the
court.

Appeal by the defendants, other than A. J. Wilcomb, from
a judgment entered on directed verdict in favor of plaintiff.

The Bank of Twin Bridges closed its doors on May 28, 1922;
late in 1923 the receiver of the bank commenced action against
A. J. Wilcomb, A. A. Linder, James P. Darnutzer and Carl N.
Darnutzer, a copartnership doing business under the name
and style of Trout Creek Land Company, upon four promissory
notes of date June 1, 1921, each signed, "Trout Creek Land

Company, by A. J. Wilcomb,'' the principal sums of which aggregated $16,828.66. The complaint filed was in the usual form in actions on promissory notes; each note constituting a separate cause of action.

Defendant Wilcomb defaulted; the remaining defendants answered generally to each cause of action, and set up three special defenses to each thereof, but in its entirety the answer alleged, as to all of the causes of action, in effect as follows: That the Trout Creek Land Company was organized in 1913 as a nontrading and noncommercial partnership, for the purpose only of carrying on a farming and stock-raising business, and so continued up to the year 1921, but was not in existence on June 1, 1921; that the making of promissory notes was not within the scope of the firm's business and not necessary for the transaction of such business; that the power to borrow money and execute notes was vested only in the members acting together, with the exception of Carl N. Darnutzer, and no one member had authority to execute a note in the name of the firm; that no one of the answering defendants had any knowledge of the execution of the notes sued upon, by Wilcomb, or authorized or ratified his act in so doing. It was further alleged that no one of the answering defendants nor the firm received any consideration for said notes, but that they were executed for the sole benefit of Wilcomb, who received whatever of value was paid for said notes; that Wilcomb was the president or cashier and the managing agent of the bank; and that the bank had full knowledge of all of said facts, and with such knowledge dealt only with Wilcomb, and paid to him for his sole benefit and personal use any consideration given for said notes. It was further alleged that the receiver paid no consideration for the notes and took them after maturity. The plaintiff replied, denying the affirmative allegations of the complaint, and affirmatively alleged that the firm was a trading copartnership.

The case was finally tried in February, 1926, before Honorable S. D. McKinnon, Judge, with a jury duly impaneled. Both sides having introduced testimony and rested, the plain-

tiff moved the court to direct a verdict in his favor. This motion was granted, verdict returned, and judgment entered thereon. The answering defendants moved for a new trial, which motion was denied; they then appealed from the judgment.

Hereafter, for the sake of brevity, the Trout Creek Land Company will be referred to as the firm, the Bank of Twin Bridges as the bank, and the answering defendants as the appellants.

1. Specifications of error numbered 1 and 2 are predicated [1] upon the action of the court in sustaining objections to a question asked of one of the directors of the bank, as to who was in active charge of the bank during banking hours for the year prior to its closing, and to an offer of proof that such person was A. J. Wilcomb.

No reversible error was committed by so ruling, as the matter of the management of the bank was fully explained, and the minutes of the board of directors showing action taken as to such question, with the witness present, was placed before the court and jury; the resolution of the board being the best evidence of what was then done. But, assuming that the witness had testified as set forth in the offer of proof, from what is hereafter said, such testimony could not have changed the result reached by the court, and the ruling did not therefore affect the substantial rights of the appellants.

2. Specifications 3, 4 and 5 have to do with the exclusion of [2] testimony to the effect that James P. Darnutzer never had any knowledge to the effect that Wilcomb was gambling on the grain market in the name of the firm, and that the witness never participated, as a member of the firm or otherwise, in buying or selling grain futures. No prejudicial error was here committed, as the facts sought to be elicited were fully brought out on the examination of this and other witnesses.

3. The remaining specifications present only the question as to whether, as contended by the appellants, the record contains evidence which should have been presented to the jury for their determination, and on which the jury could have found a ver-

dict in favor of the appellants, which verdict could not have been set aside by a court, or whether, as stated in the court's ruling on the motion for a directed verdict, the case made by the record presented only questions of law.

The record presents an amazing history of loose business methods and lack of management on the part of the members of the firm, as well as on the part of the officers of the bank. It establishes the following facts:

By oral agreement in 1913, A. A. Linder, A. J. Wilcomb, Dwight Bushnell and the copartnership of J. P. Darnutzer and Carl N. Darnutzer organized the firm for the purpose of raising wheat on lands owned by others, but later it purchased railway lands on contract, the individual members and the Darnutzer brothers sharing profits and losses. During the first year Bushnell dropped out, and the remaining members assumed a one-third interest each. All of the members were raised in the community and were intimate friends from childhood; each had the utmost confidence in the others throughout the period of their business association.

The firm had no capital and, seemingly, nothing to offer as security, but, as Wilcomb was the financial manager of the firm and at the same time the managing agent of the bank, it appeared to have unlimited credit, secured with little formality; all loans extended by Wilcomb being approved by the board of directors of the bank as routine business at its monthly meetings. As a "depositor," the firm started with an overdraft, which soon reached a sum in excess of $2,000; whereupon a note was given and the amount thereof credited to the firm's checking account. Although this left a balance in the red, the firm continued to check against the account, and, as the overdraft became topheavy, the firm periodically executed further notes, which were credited to the checking account, and, as these notes matured, they were paid by renewal notes, and, as payments on land contracts became due, the bank furnished the necessary funds and received notes from the firm. As this first series of notes appear only in the bank records, it does not appear how they were signed, and the appellants have no

recollection on the subject. Wilcomb testified for the plaintiff by deposition, and, in answer to a question as to why the notes sued upon were signed, "Trout Creek Land Company, by A. J. Wilcomb," answered, "That was the way the company had of doing business and signing notes."

Later the firm engaged in the business of purchasing, feeding and selling cattle, and this enterprise was financed by the bank either directly or by securing loans from other banks secured by liens on cattle purchased. On one such transaction the firm made a profit of $1,000, but thereafter it lost something like $5,000 on its cattle deals, and throughout the entire period of its farming operations the net result was loss. Receipts from the sale of grain were generally credited to the checking account or on notes, and the bank absorbed the losses.

Many of the firm's notes were sold to other banks, and, after the closing of the bank, it was ascertained that the firm was obligated on outstanding notes to the National Bank of Montana totaling $19,034.65, and to the National Bank of Gallatin Valley in the sum of $6,000, secured by liens upon all of the real and personal property of the firm. In addition to these secured notes, the firm of W. A. Clark & Bro., of Butte, held a note for $5,000, Sedenstocker's estate a note for $5,000, and the plaintiff the notes sued on here. In addition to these, a note was found in the bank for $5,000, in all respects like unto the four, but public accountant Lemert found data from which he was led to believe that this note was an attempted renewal of the Clark note, not accepted by that institution, and therefore advised that it be not included in the complaint.

During its period of operation, the firm issued checks upon the bank, signed for the firm by one or more of the appellants, totaling approximately $80,000, and checks signed for the firm by Wilcomb amounted to $1,431. The appellants received no statements of their account at the bank, never checked it up, and had only the most hazy idea of the financial history of the firm; they "figured that Wilcomb was taking care of the business absolutely." Linder testified that he knew nothing of the financial condition of the firm until in 1921 he visited

the National Bank of Montana, when he was told by Mr. Marlow that his portion of the firm's indebtedness of $5,000 was not correct; that the indebtedness of the firm was in excess of $25,000. He then visited J. P. Darnutzer and they together went to Wilcomb for a statement, but were put off. He did not tell Wilcomb what he had heard, justifying himself with the statement that he was so deeply indebted to the bank that he did not want to get Wilcomb down on him. Asked what was the extent of his private indebtedness to the bank and that of a partnership consisting of himself and his brother, he demonstrated that he knew no more about his private affairs than he did about those of the firm; he answered, "Probably fifty or sixty thousand dollars, or seventy."

As to dealing in grain futures, it appears that in 1916 the firm sold grain for which it received approximately $1,500. Without regard to its financial standing at the bank, and in spite of the fact that the receipts from grain sales—all of which resulted in loss—were to be turned into the bank, the members of the firm took this sum and "invested" it in wheat margins on the Minneapolis Exchange; a winning of nearly $2,500 resulted, and this "profit" was divided among the members of the firm, and the $1,500 again "invested" in like manner. In this second venture one Marion Mountjoy, an employee of the bank, was permitted to share without contribution, and one Olson, an elevator operator, joined by putting $500 into the pool; the profits from this venture amounted to $5,759, which was again divided among the speculators, and no part thereof credited on the firm's indebtedness to the bank. The $1,500 was then "reinvested," resulting in a winning of $1,000, which was divided four ways, Olson having dropped out. Finally the $1,500 was lost, and with it went an indefinite sum, which was evidently covered by further notes to the bank. After this disastrous venture, according to Linder's testimony, Wilcomb intimated that he did not want the bank to know what had been going on, and did not like to have drafts of this nature coming through the bank; whereupon Linder told him that the speculators were still a little ahead

on their gambling transactions and had better quit gambling. Carl N. Darnutzer was sick during all of this time and had no knowledge of what was going on, according to his testimony, and J. P. Darnutzer testified that he never had knowledge that notes were given for money used in playing the market.

Accountant Lemert's investigation disclosed that, during the firm's period of operations, notes were given to the bank totaling $160,000, and that between October, 1916, and April, 1920, the firm remitted by draft on the bank and to brokerage establishments in Minneapolis, a total of $129,813.27, and received return drafts and credits amounting to $79,306.25, all of which was credited on the books of the bank either to the firm or to members thereof, with the exception of $11,000, which he could not trace.

The notes in question were traced by the witness Lemert as renewals and renewals of renewal notes credited to the checking account of the firm, and the deposits thereby made were checked out by the firm on checks generally signed by Linder, heretofore mentioned.

In support of their contention that there is ample evidence in the record to have warranted a verdict in favor of appellants, counsel contend (1) that the record discloses an agreement between the members of the firm that no note should be executed by the firm except it be signed by all of the members, and that the bank had knowledge thereof; (2) that by its dealing with the bank over a long period of time, the firm established a custom within itself, known to the bank, requiring the signatures of all of the members to notes executed by it, and that, by the nature of its business, it was not necessary that the firm execute notes; (3) that the firm was a nontrading and noncommercial copartnership; (4) that neither the firm nor any of its members, other than Wilcomb, received consideration for the notes in suit; (5) that Wilcomb could not alone bind the firm; (6) that Wilcomb received the entire consideration for these notes for his own use and benefit; (7) that the firm did business with the bank, which institution had a regularly functioning board of directors which approved the loans

of the firm, and, as Wilcomb was an officer of the bank and a member of its said board, knowledge secured by Wilcomb was imputable to the bank; (8) that the receiver paid nothing for the notes and took them after maturity; and (9) that the firm was dissolved prior to the date of the notes sued upon.

1. The assertion that the record discloses an agreement [3] between the members of the firm regarding the manner of executing the notes which was known to the bank, is based upon the following testimony: Linder and Darnutzer each testified that ''Wilcomb said that the bank required the signatures of the different members of the Trout Creek Land Company, and he said he thought that it would be better that each of us sign the notes, and I said that was very satisfactory to me.'' It is not necessary to determine whether knowledge of this conversation by Wilcomb, as an officer of the bank, was imputable to the bank, for the reason that no agreement was established. It is true that the appellants on the stand attempted to testify that such an agreement was had, but they were required by the court to give the conversation from which they drew their conclusion, and from the evidence of what actually transpired it clearly appears that Wilcomb merely announced a custom or requirement of the bank for its benefit and which it could, if it saw fit, waive at any time. The testimony fell far short of establishing an agreement or of showing that any member of the firm then intended the conversation to constitute an agreement. (See *Durlacher* v. *Frazer,* 8 Wyo. 58, 80 Am. St. Rep. 918, 55 Pac. 306; *Cogshall* v. *Pittsburg Roller Milling Co.,* 48 Kan. 480, 29 Pac. 591.)

2. Nor does the evidence establish a custom of the firm known [4] to the bank, requiring that all notes of the firm be signed by all of the members, for the record discloses notes, acknowledged as firm notes and paid or renewed as such, signed only by one or more members of the firm, or signed as were the notes in question and indorsed on the back by the individuals constituting the firm, while the appellants have no recollection as to how many of the notes of the firm were signed.

77 Mont.—27

3. It is contended that the firm was a nontrading copartner-
[5]  ship. The question is important, as in such a partnership
a partner has no implied power to borrow money and give firm
mercantile paper therefor. (George on Partnership, 92.)
"The test of the character of the partnership is buying and
selling. If it buys and sells, it is commercial or trading; if it
does not buy or sell, it is one of employment or occupation."
(*Lee* v. *Bank*, 45 Kan. 8, 11 L. R. A. 238, 25 Pac. 196.) "The
partnership must be in a trade or concern to which the issuing
or transfer of bills is necessary or usual" (Chitty on Bills,
13th ed., 58), and although a firm may ordinarily come within
the definition of a nontrading partnership, where the partner-
ship engages in trading requiring capital and the use of credit,
the rule as to nontrading partnerships does not apply. (*Kim-
bro* v. *Bullitt*, 22 How. 256, 16 L. Ed. 313; Daniels on Nego-
tiable Instruments, 6th ed., 449.)

Here no question of fact arises; the facts are undisputed.
They show that the firm engaged in buying and selling cattle,
as well as in farming and selling grain, and that it required
capital and the use of credit; in fact, it operated from the be-
ginning on credit alone, and established a custom within itself
long prior to the issuance of the notes in question. Whether
the firm was a trading or nontrading partnership was but
a question of law for the court. It appears that the issuance
of negotiable paper was justified by custom and necessity of
the firm as well as by the fact that the firm engaged in trading.
(*National State Capital Bank* v. *Noyes*, 62 N. H. 35.)

4. As the notes were traced back on the books of the bank
[6]  as renewals of notes, the proceeds of which were credited
to the checking account of the firm, it is apparent that the bald
statement made by the appellants, that neither as individuals
nor as members of the firm did they receive any consideration
for the notes, presents no issue requiring determination by the
jury.

5. As the firm was a trading partnership, each member of
[7]  the firm was the agent for the partnership in the transac-
tion of its business and had authority to do whatever was
necessary to carry on such business in the ordinary manner,

and for that purpose could bind the partnership by an agreement in writing (sec. 7997, Rev. Codes 1921), and notes executed by one of the partners for the benefit of the firm became partnership obligations, binding upon all of the members of the firm, in the absence of bad faith on the part of the contracting partner and, if bad faith existed, knowledge thereof on the part of the payee. (Sec. 7999, Rev. Codes 1921; *Hefferlin* v. *Karlman,* 29 Mont. 139, 74 Pac. 201.)

6. But it is contended that Wilcomb used the firm credit [8] for the purpose of playing the wheat market, without authority from the other members of the firm, and, in this, acted with bad faith toward his copartners. Even though this be admitted to be true, the borrowing was ostensibly authorized, and, if the bank was a *bona fide* lender, it was entitled to recover on the notes, even though the partner borrowing was actually obtaining the money for his own use. (Mechem on Partnership, sec. 258; *Hayward* v. *French,* 12 Gray (Mass.), 453.)

7. It is contended, however, that the bank was not a *bona* [9, 10] *fide* lender as Wilcomb had full knowledge of all the facts regarding the notes and their purpose, and, as Wilcomb acted as agent for the bank in the transaction, his knowledge was imputed to the bank. In passing, it may be said that the record clearly discloses that Wilcomb was superseded as managing agent of the bank three days before the notes were given, but, as the notes were renewals of other notes issued as far back as 1919, this fact may be disregarded.

It is the general rule that knowledge obtained by an officer of a bank while acting for the bank, is imputed to the bank, but knowledge obtained by such officer while acting, not on behalf of the corporation but for himself, or in a manner antagonistic to the corporation, is not imputable to it (*Grosfield* v. *First Nat. Bank,* 73 Mont. 219, 236 Pac. 250), or, as stated in Fletcher's Cyc. Corporations, section 2248, knowledge acquired by an officer or agent of a corporation is not imputable to it when it is acquired concerning transactions in which the officer's interests are adverse to those of the corporation.

While in some jurisdictions it is held that, where but the single officer of the corporation transacts the business in hand with himself personally or for his firm, without the co-operation of any other officer of the corporation, his knowledge is imputable to the corporation (14a C. J. 442; *Gila L. & W. Co.* v. *Brown,* 20 Ariz. 400, 181 Pac. 457; *Taylor* v. *Felder,* 3 Ga. 287, 59 S. E. 844), there is respectable authority to the contrary (*First Nat. Bank* v. *Foote,* 12 Utah, 157, 42 Pac. 205; *Bank of Overton* v. *Thompson,* 118 Fed. 798, 56 C. C. A. 554; *Gunster* v. *Scranton etc. Co.,* 181 Pa. 327, 59 Am. St. Rep. 650, 37 Atl. 550). But, whether the rule is sound or otherwise, here we go one step further: The record clearly discloses that Wilcomb's action in making loans and accepting notes did not close the transactions had for the firm; the loans were passed upon and approved by the board of directors. The reason for the rule above is that, where the officer in question is the sole representative of the corporation, there is no one to whom to impart his knowledge and no one from whom he may conceal it (*First Nat. Bank of Blaine* v. *Blake* (C. C.), 60 Fed. 78); but here, where there is a board of directors required to pass on the proposed loan, this reason fails. Under such circumstances it seems to be universally held that knowledge acquired by the president or cashier of a bank, as a member of a firm and not as a bank official, is not imputable to the bank. (*Amarillo Nat. Bank* v. *Harrell* (Tex. Civ. App.), 159 S. W. 858; *Seixas* v. *Citizens' Bank,* 38 La. Ann. 424; *Atlantic State Bank* v. *Savery,* 82 N. Y. 291. See, also, *Camden Safe Deposit & Trust Co.* v. *Lord,* 67 N. J. Eq. 489, 58 Atl. 607; *Smith* v. *Wallace Nat. Bank,* 27 Idaho, 441, 150 Pac. 21.)

Under the facts shown by the record, knowledge acquired by Wilcomb as a member of the firm was not imputable to the bank by reason of the fact that he was the managing agent of the bank, and there is therefore no evidence in the record which destroys the *bona fides* of the bank in making the loan.

This discussion also disposes of the assertion that Mountjoy, as an officer or employee of the bank, had knowledge of Wil-

comb's actions; he was acting jointly with Wilcomb as a speculator and not on behalf of the bank.

8. That the receiver paid nothing for the notes and took [11] them after maturity does not affect the situation. The receiver was not a purchaser; he merely stepped into the shoes of the bank; his rights are those of the bank, no greater and no less. (*Williams* v. *Johnson*, 50 Mont. 7, Ann. Cas. 1916D, 595, 144 Pac. 768.)

9. It is lastly contended that the partnership was dissolved [12] and the firm had gone out of business prior to the execution of the notes sued upon. The utmost that the record shows is that, in 1920, for the purpose of producing the 1921 crop, the members of the partnership agreed to each furnish his share of the expenses from private funds. The acts of the partners at that time do not constitute dissolution in any manner prescribed in section 8009, Revised Codes of 1921, and, even though a dissolution had then been effected, the liability of the members for the acts of a partner continued, so far as the bank was concerned, until it had personal notice of the dissolution. (Sec. 8012, Rev. Codes 1921.) No such notice was shown. The appellants again rely merely upon the notice which Wilcomb acquired as a partner.

All questions necessary to a final determination of the case were merely questions of law, determinable upon the facts as presented to the trial court by counsel for the appellants, and there were therefore no material issues of facts for the determination of the jury, and the court was justified in directing a verdict. As it correctly determined the questions of law presented, the judgment must be affirmed.

Judgment affirmed.

*Affirmed.*

JUSTICES GALEN and STARK, HONORABLE C. W. POMEROY, District Judge, sitting in place of MR. CHIEF JUSTICE CALLAWAY, disqualified, and HONORABLE THEODORE LENTZ, District Judge, sitting in place of MR. JUSTICE HOLLOWAY, absent on account of illness, concur.